UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THOMAS A. FOX, et al.,

                Plaintiff,                      Case No. 1:19-cv-11887

v.                                    Honorable Thomas L. Ludington
                                          United States District Judge

COUNTY OF SAGINAW, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

This case boils down to a basic principle: A "taxpayer must render unto Caesar what is Caesar's, but no more." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 647 (2023). For years, Michigan's General Property Tax Act (GPTA) defied that principle. The statute, the work of the Michigan government, created a process that authorized Michigan counties to foreclose on and auction tax-delinquent property. That much is unremarkable; municipal governments have always been extended the authority to enforce and collect property taxes. But until late 2020, when the auction price exceeded the taxes, interest, penalties, and fees owed, the GPTA permitted counties to keep the difference—what courts have called "surplus proceeds." *Freed v. Thomas*, 81 F.4th 655, 658–59 (6th Cir. 2023).  All agree that part of the law could not stand. *Bowles v. Sabree*, 121 F.4th 539, 545 (6th Cir. 2024).

So how do these Michiganders get their money back when, based on a Michigan statute, they rendered unto Caesar more than Caesar was due? Over six years ago, Plaintiff Thomas Fox thought that this class action on behalf of property owners like himself could work. The dozens of other Plaintiffs who later joined him in suing the 27 Defendant Counties in this case thought so too.

But during this case, many hurdles slowed Plaintiffs' efforts to recover their surplus proceeds. Even so, in November 2024, the Sixth Circuit admonished Michigan governments that "one way or another," they need "to pay up." *Bowles*, 121 F.4th at 556. Soon after, the Parties agreed to a class settlement. Plaintiffs now move for the preliminary approval of the Parties' proposed class settlement. As explained below, Plaintiffs' Motion will be granted.

## I.

### A. Legal Backdrop

Before plunging into the facts of this case, a background on the law and Michigan's General Property Tax Act (GPTA) is helpful. So this Court will provide that context before addressing the case's particulars.

### 1. Historical Legal Framework for Tax Foreclosure Proceedings

The United States Constitution's Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Still, states and their municipalities possess broad power to tax and to collect unpaid taxes, including by foreclosing on real property with delinquent taxes. *Jones v. Flowers*, 547 U.S. 220, 234 (2006). But that power ends when those governments keep more than they are owed in taxes and related fees or penalties. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 639 (2023).

These principles are centuries old. At Runnymede in 1215, King John swore in the Magna Carta that sheriffs could seize property to pay debts "until the debt which is evident shall be fully paid." *Tyler*, 598 U.S. at 639 (citing W. McKechnie, *Magna Carta, A Commentary on the Great Charter of King John*, ch. 26, p. 322 (rev. 2d ed. 1914)). Seventeenth-century English statutes gave the Crown power to seize property for taxes but required "any [o]verplus" from a sale to be "immediately restored to the [o]wner." *Id.* (quoting 4 W. & M., ch. 1, § 12, in 3 Eng. Stat. at Large

488–89 (1692)). Likewise, English common law "required the seller to 'render back the overplus.'" *Howard v. Macomb Cnty.*, 133 F.4th 566, 569 (6th Cir. 2025) (quoting 2 William Blackstone, *Commentaries on the Laws of England* *284 (1766)).

These principles later "traveled across the Atlantic" to America. *Tyler*, 598 U.S. at 640. Colonial and early American laws treated surplus proceeds or "equity" as private property belonging to the owner. *Hall v. Meisner*, 51 F.4th 185, 194–95 (6th Cir. 2022). States devised various processes for owners to recover the surplus, including direct return, judicial claims, or sale limits to avoid surpluses altogether. *Tyler*, 598 U.S. at 639–40. But historically, no government could retain surplus proceeds without offering a way to recover them; else, they would effectuate an unconstitutional taking. *Id.*; *see also United States v. Taylor*, 104 U.S. 216 (1881); *United States v. Lawton*, 110 U.S. 146 (1884). And in many ways, the practice of retaining proceeds also transforms a tax-foreclosure scheme into a tax-forfeiture and fine scheme. *See id.* at 648–50 (Gorsuch, J., concurring); *but see Freed v. Thomas*, 81 F.4th 655, 659 (6th Cir. 2023). All said, "more than two centuries of Anglo-American property law" made clear that a government could not retain any surplus flowing from a tax-foreclosure process. *Hall*, 51 F.4th at 195.

## 2. Michigan's GPTA and Pre-2020 Defects

With those historical constitutional principles looming in the background, in 1999, Michigan overhauled its GPTA, revamping and adding many provisions governing property taxes. *See Rafaeli, LLC v. Oakland Cnty.*, 952 N.W.2d 434, 442 n.10 (Mich. 2020). These provisions feature a tax-foreclosure scheme for the state and local governments to recover unpaid real-property taxes, penalties, interest, and fees. MICH. COMP. LAWS § 211.78 *et seq.* Under that scheme, a "foreclosing governmental unit" (FGU) initiates these foreclosures, which is, in most cases, a Michigan county. *See, e.g.*, *id.* §§ 211.78h, k. For a specified period, the GPTA allowed

counties to opt out of becoming an FGU. *Id.* § 211.78(3). But as of 2019, "[75] of Michigan's 83 counties elect[ed] to act as the [FGU.]" *Rafaeli*, 952 N.W.2d at 442 n.11.

Once a county chooses to be an FGU, the GPTA permits it to foreclose on tax-delinquent properties. *See* MICH. COMP. LAWS §§ 211.78h, k. But after choosing to foreclose, a county must follow the GPTA's detailed process. *See id.* § 211.78m. If the owner failed to pay the tax debt after foreclosure proceedings began, title vested absolutely in the county, free of liens. *Id.* §§ 211.78k(5)–(6). Generally, the county must then sell the foreclosed property at an auction, either individually or bundled with other foreclosed properties. *See id.* § 211.78m(2). As permitted by the GPTA, the counties retain the entire sale price, even when it far exceeds the tax debt, interest, and costs. *See id.* § 211.78m(8); *see also Rafaeli*, 952 N.W.2d at 446. So for example, a $1,000 tax debt could yield a $10,000 auction sale, with the county retaining the $9,000 in surplus proceeds. Importantly, until December 2020, the GPTA gave former owners no right to recover their surplus proceeds.[1] *Rafaeli*, 952 N.W.2d at 446.

Absent a right for property owners to recover their surplus proceeds, the GPTA's framework violated the historical rule that the government may take only what it is owed. Indeed, in 2020, in *Rafaeli, LLC v. Oakland County*, the Michigan Supreme Court found that this statutory scheme violated Michigan's takings clause. 952 N.W.2d at 460–61. Then, in 2022, the Sixth Circuit found that it violated the United States Constitution's Takings Clause. *Hall*, 51 F.4th at 196. And in 2023, the United States Supreme Court agreed and held that schemes like the GPTA's spurn the Takings Clause. *Tyler*, 598 U.S. at 639 (finding similar state scheme unconstitutional).

---

[1] As an aside, the Supreme Court implicitly noted in *Tyler* that a total of fourteen States used the same or similar foreclosure process as Michigan when it issued *Tyler* in 2023. *Tyler*, 598 U.S. at 642.

### 3. Michigan's GPTA After Enacting PA 256 in 2020

Responding to *Rafaeli*, Michigan's Legislature enacted Public Act 256 ("PA 256") in December 2020, attempting to cure the constitutionally defective GPTA process. MICH. COMP. LAWS § 211.78t. PA 256 amended the GPTA and created an "exclusive" state law path for former owners to recover surplus proceeds from the sale of tax-foreclosed property. *Id.* § 211.78t(1), (11). Yet what Michigan lawmakers did not do is perhaps as telling as what they did: though they created the unconstitutional regime by authorizing counties to retain surplus proceeds, their "curative" amendments did not include the funds to repay the taxpayers.

In any event, to use the PA 256 process, immediately following the sale of their tax-delinquent property, a claimant—that is, "a person with a legal interest in property immediately before" a foreclosure—"must notify the foreclosing" county that they are seeking their surplus proceeds by submitting a prescribed form to the county. *Id.* § 211.78t(2). After filing their notice, property owners may submit claims for their surplus proceeds in the state circuit courts that oversaw their foreclosure proceedings: call these "PA 256 Motions." *Id.* § 211.78t(6). A successful PA 256 Motion is subject to a specific formula spelled out by Michigan's Legislature. The beginning of the formula calculates a baseline: the difference between the price paid for the claimant's property at auction and the "minimum bid," which is the sum of the delinquent taxes, interest, and certain foreclosure costs. *Id.* § 211.78t(12)(b)(i). Then subtract all other allowable expenses tied to the forfeiture, foreclosure, sale, maintenance, repair, and remediation of the property that are not part of the minimum bid. *Id.* § 211.78t(12)(b)(ii). Finally, subtract a 5% commission payable to the FGU. *Id.* § 211.78t(12)(b)(iii). What remains is the pool to be distributed—often resulting in claimants recovering 95% of their baseline surplus proceeds (due to the 5% commission).

But that pool does not automatically transfer to the former owner. At a hearing, the relevant circuit court must "determine the relative priority and value of" each claimant's interest "in the foreclosed property immediately before the foreclosure." *Id.* § 211.78t(9). After that, the court must "allocate any" proceeds "consistent with its determination." *Id.* The court also deducts other obligations a claimant may have owed—for example, unpaid rent to tenants at the time of foreclosure, outstanding civil fines for ordinance violations, and superior tax liens. *Id.* And the statute directs these courts to avoid "unjust enrichment" at the public's expense when distributing surplus funds. *Id.*

In the end, the point is straightforward: PA 256 seeks to restore to claimants only what remains after the public has been paid what it is owed, other legal interests have been satisfied, and statutory costs have been covered. *Id.* § 211.78t(9), (12)(b). And the Sixth Circuit has held that this framework facially ensures that "Caesar" gets exactly what belongs to him—no more, no less—curing the GPTA tax-foreclosure scheme's prior constitutional takings defects. *Howard*, 133 F.4th at 571 ("Michigan now does what" Supreme Court precedent "and background historical principles allow."); *cf. Tyler*, 598 U.S. at 647.

For some time, it was unclear whether and how PA 256 applied to tax foreclosures conducted before its enactment. But on July 29, 2024, in *Schafer v. Kent County*, the Michigan Supreme Court ruled that, subject to reasonable time constraints, PA 256 "applies retroactively to claims arising" before its enactment. 2024 WL 3573500, at *2 (Mich. July 29, 2024). Put differently, even owners with properties foreclosed on before PA 256's enactment could pursue their surplus proceeds with a PA 256 Motion. *Id.*

### B. This Case

### 1. The Litigation

Against that legal backdrop, "rewind a few years" to 2017. *Bowles*, 121 F.4th at 546. According to Plaintiff Thomas Fox, in 2017, he had "a tax delinquency of approximately $3,091.23" for his property located in Gratiot County, Michigan. ECF No. 1 at PageID.4–5; ECF No. 1-2 at PageID.23. Based on that delinquency, under the pre-PA 256 GPTA, Defendant Gratiot County foreclosed on his property, auctioned it for $25,000, and retained the $21,908.77 in surplus proceeds. *See* ECF No. 1 at PageID.5–6. So on June 25, 2019, Plaintiff Fox filed a putative class action against several Michigan Counties and their treasurers, challenging the pre-PA 256 GPTA tax-foreclosure scheme's lawfulness. *See generally* ECF No. 1.

To that end, the original complaint alleged, among other things, that the counties' participation in this tax-foreclosure scheme violated the putative class members' state and federal constitutional rights. *Id.* at PageID.11–19. Specifically, the original complaint asserted five claims, alleging that the old GPTA's tax-foreclosure scheme: effectuated an unconstitutional taking under the Fifth and Fourteenth Amendments (Counts I and II); failed to heed Michigan's Uniform Condemnation Procedure's Act, Mich. Comp. Laws § 213.51, *et seq.*, effecting an unlawful inverse condemnation (Count III); violated Article X, Section 2 of the Michigan Constitution (Count IV); and imposed an excessive fine, violating the Eighth Amendment (Count V). *Id.*

Soon after, Plaintiff Fox amended his complaint. ECF No. 17. The Amended Complaint named additional counties and treasurers as defendants and added three claims: a procedural due process claim under the Fourteenth Amendment (Count VI), a substantive due process claim under the Fourteenth Amendment (Count VII), and a state-law unjust enrichment claim (Count VIII). *Id.* at PageID.216–18, 237–39. As a result of these amendments, Plaintiff Fox asserted eight claims

- 7 -

in total against 27 counties and their treasurers. *See generally id.* Although only Defendant Gratiot County retained his surplus proceeds, Plaintiff Fox remained the sole named plaintiff.

Myriad motions followed the Amended Complaint. Several Defendants moved to dismiss the Amended Complaint. ECF Nos. 22; 23; 66; 119; 120; 123. For his part, Plaintiff Fox moved to certify the putative class. *See* ECF No. 93. Ultimately, this Court granted the certification motion and certified Plaintiff Fox's class on October 16, 2020. ECF No. 124. And this Court granted in part and denied in part the motions to dismiss the amended complaint, leaving four claims: (1) the Fourteenth Amendment Takings claim; (2) the state-law inverse condemnation claim; (3) the Fourteenth Amendment Procedural Due Process Claim; and (4) the state-law unjust enrichment claim. *See* ECF No. 148.

Defendants appealed the Class-Certification Order. Defendants argued that Plaintiff Fox lacked standing to sue 26 of the Defendant Counties because only Defendant Gratiot County foreclosed on his property. *See Fox v. Saginaw Cnty., Michigan*, 67 F.4th 284 (6th Cir. 2023). Plaintiff responded that the GPTA's foreclosure processes juridically linked Defendant Gratiot County's conduct to all Defendants, who had complied with the same scheme. *Id.* Ultimately, at the same time it tightened class certification requirements to prudentially guard against suspect class suits, the Sixth Circuit rejected the juridical-link doctrine and vacated the Class-Certification Order. *Id.* at 288. Yet the Sixth Circuit noted during oral argument that Plaintiff Fox could easily fix the standing problem by adding a plaintiff for each Defendant County. ECF No. 412 at PageID.10453.

On remand, Plaintiff Fox did just that. Plaintiff Fox and twenty-four other Plaintiffs filed a second amended complaint with class allegations against the 27 Defendant Counties, bringing

the same eight claims Plaintiff Fox initially brought.[2] *Compare* ECF No. 363 at PageID.93–103 *with* ECF No. 1 at PageID.11–18. After that, the Parties filed a flurry of motions. These motions ranged from discovery disputes to dispositive motions. *See, e.g.*, ECF Nos. 363; 420; 429; 430; 434. And by October 2024, the Parties' pending motions approached double digits.

### 2. Proposed Settlement and Motion for Preliminary Approval

But then the Parties shifted gears. On November 9, 2024, the Parties attended mediation, resulting in a "settlement framework." ECF No. 479-3 at PageID.11972. After that, the Parties continued to negotiate settlement details, which they eventually finalized. *See id.* The proposed Settlement Agreement includes several key terms described below.

***Class Definitions.*** The Settlement Agreement contemplates a primary class (the "Class"), with Plaintiff Fox listed as the proposed class representative, and 27 subclasses (the "Subclasses") with proposed representatives for each of them. *Id.* at PageID.11978–79. The Parties define the Class as follows:

> All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in any County which Property, that during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom the County did not refund the Surplus Proceeds.

*Id.* at PageID.11978. Each Subclass is defined the same way, but each applies to a specific Defendant County, substituting that county's name into the definition. *Id.*

***Limits on Class Membership.*** The Settlement Agreement places boundaries on Class membership. Up front, certain individuals are excluded from the Class altogether. This category

---

[2] Plaintiffs also sued the Defendant Counties' Treasurers, but the Parties stipulated to dismiss them. *See* ECF No. 411. That dismissal makes sense: county treasurers are entitled to Eleventh Amendment sovereign immunity because once the Defendant Counties chose to serve as FGUs, the treasurers are duty-bound by the GPTA; the Defendant Counties, by contrast, are not entitled to sovereign immunity because they voluntarily chose to serve as FGUs. *See Bowles*, 121 F.4th at 546, n.1.

included anyone who, after foreclosure, has released or otherwise resolved a surplus-proceeds claim by agreement or final judgment. *Id.* at PageID.11979. The sole exception applies to those who resolved such a claim between March 31, 2025, and the October 31, 2025, withdrawal deadline for PA 256 Motions; such persons are permitted to participate if they withdraw the PA 256 Motion by October 31, 2025, though only as Limited Settlement Class Members. *Id.*

Even among those who satisfy the class definition, the Settlement Class—the body entitled to payment—excludes additional categories. The first consists of those who elect to opt out, along with those whose co-claimants on the same property do so. *Id.* at PageID.11979–80. The second consists of those who filed a PA 256 Motion and fail to withdraw it by October 31, 2025. *Id.* at PageID.11980. The third consists of those whose property is the subject of a PA 256 Motion filed by another person, like a lienholder; in that circumstance, all claimants to that property are excluded unless more than 5% of the properties for the relevant county are subject to such motions filed by non-Class Members, in which case the claimants may remain, though only as Limited Settlement Class Members. *Id.* This "5% threshold" ensures that, in counties where non-Class Member claims are unusually prevalent, participation in PA 256 litigation will not unduly narrow the field of those eligible for relief. PA 256 Motions thus operate under a distinct rule: filing one does not itself constitute a release or final resolution, but it does trigger exclusion from the Class unless the motion is withdrawn by the specified deadline, or the county meets the limited-participation threshold.

***Monetary Recovery Formulas.*** The Settlement Agreement prescribes formulas for determining the monetary relief available to Class Members. For most, the calculation is straightforward: Class Members generally receive 125% of their surplus proceeds—defined as the difference between the property's auction price and the sum of all delinquent taxes, interest,

penalties, fees, costs, and related expenses—less any attorneys' fees that this Court approves. *Id.* at PageID.11975, 11987. For Limited Settlement Class Members, whose recovery is reduced by court-ordered payments to others, the formula adjusts accordingly: they receive 125% of the remaining surplus proceeds after deducting the amount paid to those other claimants. *Id.* at PageID.11987. The Agreement offers a simple illustration: where surplus proceeds are $100,000 and $70,000 is paid to another claimant, the Limited Settlement Class Member receives 125% of $30,000, or $37,500. *Id.*

The Agreement also anticipates circumstances in which a Defendant County's total obligations would exceed its "Maximum Liability"—defined as 90% of the total surplus proceeds from eligible properties sold between January 1, 2013, and December 31, 2020, plus the county's share of administrative costs. *Id.* at PageID.11974, 11987. In that event, the Maximum Liability is distributed on a *pro rata* basis. Each claimant's share is determined by comparing that claimant's surplus proceeds to the total surplus proceeds for all eligible claims in the Defendant County. *Id.* at PageID.11988. The Agreement explains the point: if a Defendant County's Maximum Liability is $330,000 and its share of administrative costs is $30,000, and if 125% of all surplus proceeds for eligible claims totals $400,000, the alternative formula applies. *Id.* A claimant with a 125% surplus proceeds total of $125,000 would recover $93,750 under the alternative formula—reflecting 93.75% of his actual surplus proceeds—before attorneys' fees. *See id.*

Other provisions address additional situations requiring proportional distribution. Where properties were sold in bundles under MICH. COMP. LAWS § 211.78m(2), surplus proceeds are allocated *pro rata* based on the number of properties in the bundle. *Id.* at PageID.11989. For example, if a claimant owned two properties sold in a seven-property bundle yielding $70,000 in surplus proceeds, the claimant's share is $20,000—two-sevenths of the total. *Id.*

*Plaintiffs' Attorneys' Fees and Release of Claims.* The Settlement Agreement also caps any attorneys' fee requests and includes a release-of-claims provision. For attorneys' fees, Class Counsel may only seek 20% of the payments made to Class Members and may petition for costs up to $25,000. *Id.* at PageID.11990–91. And in exchange for the monetary relief described above, the Defendant Counties receive a full release of claims arising out of the settled properties.

On August 5, 2025, without opposition, Plaintiffs moved for preliminary approval of the proposed class settlement. ECF No. 479. They also seek an initial determination of whether a class is likely certifiable for the purposes of the settlement and approval of the settlement notices and plans. *See generally id.*

## II.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation modified). As a result, class litigation involves considerable judicial oversight. *See id.* True, at times, this oversight can "make[] mountains out of molehills—sometimes fairly so, sometimes not." *Speerly v. Gen. Motors*, *LLC*, 143 F.4th 306, 315 (6th Cir. 2025) (en banc). And occasionally, requiring parties to scale these mountains hampers the efficient resolution of a dispute or remedying a legal harm. *See In re Nat'l Prescription Opiate Litig.,* 976 F.3d 664, 676 (6th Cir. 2020). But because class litigation "magnifies the stakes of litigation and can thus have massive ramifications for plaintiffs and defendants alike," courts must scrupulously discharge their oversight duties. *In re Ford Motor Co.*, 86 F.4th 723, 726 (6th Cir. 2023).

One such oversight duty stems from proposed class settlements. Indeed, Civil Rule 23(e) requires judicial approval of any settlement agreement that binds absent class members. FED. R. CIV. P. 23(e). To that end, a court must undertake a two-step approval process for proposed class

settlements: preliminary approval and final approval. *See id.* At the preliminary-approval stage of a proposed class settlement, courts ask "simply whether the settlement is fair enough" to begin the class-notice process. *Garner Props. & Mgmt. v. City of Inkster*, 333 F.R.D. 614, 626 (E.D. Mich. 2020). And for preliminary approval, the parties must "provide the court with information sufficient to enable it to determine whether" such notice is appropriate. FED. R. CIV. P. 23(e)(1)(A). After reviewing the submitted information, a "court must direct notice" of the proposed settlement "to all class members" bound by it if the court can likely (1) "certify the class for purposes of judgment on the proposal," and (2) approve the settlement under Civil Rule 23(e)(2)'s final approval requirements. FED. R. CIV. P. 23(e)(1)(B).

### III.

To apply this preliminary approval framework, this Court must do three things here. First, it must determine whether the class is likely certifiable for settlement purposes. Second, if the class is likely certifiable, this Court must then analyze whether the Settlement Agreement likely meets the final approval requirements. Third, it must ensure that the proposed notice to Class Members complies with Civil Rule 23's notice requirements. For the reasons explained below, the proposed Settlement survives all these analyses for the purposes of preliminary approval.

### A. Class Certification Analysis

Before preliminarily approving a proposed class settlement, courts must assess whether they can likely certify it. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Civil Rule 23 governs the class certification analysis. *Id.* Thus, although a "trial court has broad discretion in deciding whether to certify a class," that discretion "must be exercised within the framework of Rule 23." *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011). Under that framework, courts

cannot rubber-stamp class certification motions. *See Dukes*, 564 U.S. at 351. Instead, class actions "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23" are met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Moving to these all-important Civil Rule 23 prerequisites, the party seeking class certification must affirmatively prove two sets of requirements before a court can certify a class: (1) each of the "prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions provided for by Rule 23(b)." *Pilgrim*, 660 F.3d at 945. A party's "failure on either front dooms the class." *Id.*

Further, proposed subclasses sometimes require additional analysis. But how much analysis varies based on what type of subclass the parties present. If the parties present a "compulsory subclass"—one necessary to avoid intraclass conflicts—or a subclass independent of the overarching class, it is "treated as a class," FED. R. CIV. P. 23(c)(5), and must survive the Civil Rule 23(a) and (b) prerequisites. 3 *Newberg and Rubenstein on Class Actions* § 7:29 (6th ed. 2025); *see also Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 760 (E.D. Mich. 2024); *Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364, 368 (7th Cir. 2012). Moreover, independent class counsel and representatives must represent compulsory subclasses to purge representation of conflicts of interest. But where, as here, the parties present a "permissive subclass," simply used as a case management device in complex litigation, the subclass need not undergo Civil Rule 23(a) and (b) analyses or have separate class counsel and representatives.[3] *See Schilling v. PGA Inc.*, 293 F. Supp. 3d 832, 837 (W.D. Wis. 2018) (citing 3 *Newberg and Rubenstein on Class Actions* § 7:29).

---

[3] Although the Parties' Subclasses are permissive, to the extent assessing the Subclasses' compliance with Civil Rule 23(a) and (b) is necessary, based on the information provided by the

Finally, if the court deems the class likely certifiable for settlement purposes, it must then appoint interim class counsel. FED. R. CIV. P. 23(g)(1). In so doing, the court must assess various factors outlined in Civil Rule 23(g), probing the proposed class counsel's competence and potential conflicts of interest. *See id.*; *see also Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 626–28 (6th Cir. 2007).

## 1. Rule 23(a) Requirements

Begin with the Civil Rule 23(a) prerequisites. The Civil Rule 23(a) prerequisites require Plaintiffs to satisfy four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. FED. R. CIV. P. 23(a). Each will be addressed in turn.

### a. Numerosity

A proposed class or subclass must first be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). There is no bright-line threshold for numerosity. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Rather, "substantial numbers will suffice." *Bowles v. Sabree*, 121 F.4th 539, 552 (6th Cir. 2024) (citation modified). For example, the Sixth Circuit has certified classes with as few as 35 class members. *Young v. Nationwide Mut. Ins.*, 693 F.3d 532, 542 (6th Cir. 2012). But as a practical guide, classes with fewer than twenty members usually fail, while those exceeding forty are presumed to pass. *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998); *see also Curry v. SBC Commc'ns, Inc.*, 250 F.R.D. 301, 310 (E.D. Mich. 2008); 1 *Newberg and Rubenstein on Class Actions* § 3:12 (6th ed. 2025). Importantly, plaintiffs need not prove the exact headcount—they must only provide a factual basis from which

---

Parties, this Court is satisfied that they are likely certifiable for the purposes of preliminary approval. Of course, reassessment could be necessary at the final approval phase.

the court can draw a reasonable inference. *Young*, 693 F.3d at 541; *Bowles*, 121 F.4th at 552–53; *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 601 (E.D. Mich. 1985).

Here, Plaintiffs seemingly satisfy the numerosity requirement. Based on public records submitted by Plaintiffs, which include only three of the seven-year class period, the proposed class likely exceeds 1,000 people. *See* ECF No. 331-3 at PageID.8105–31. Joinder of thousands of plaintiffs dispersed over 27 counties is not practicable. *See Bowles*, 121 F.4th at 553; *see also In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 297 (N.D. Ohio 2007); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D. Ohio 1991). So Plaintiffs likely satisfy the first prerequisite.

### b. Commonality

While numerosity is generally a molehill, the next Civil Rule 23(a) prerequisite—commonality—can be a mountain. *See Speerly*, 143 F.4th at 316–20. To clear "the commonality bar," a class must share common questions of law and fact. *In re Ford Motor Co.*, 86 F.4th at 727; *see also* FED. R. CIV. P. 23(a)(2). A single question suffices. *Dukes*, 564 U.S. at 359. But for a question to be common, it "must (1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit." *Speerly*, 143 F.4th at 316; *see also Dukes*, 564 U.S. at 350; *In re Ford Motor Co.*, 86 F.4th at 727. To meaningfully progress the lawsuit, a question must affect at least one disputed element of each of the class's claims, which often overlaps "with the merits inquiry." *Speerly*, 143 F.4th at 316–18. In this way, "not every question with a common answer meets" Rule 23(a)(2)'s commonality requirement. *Id.* at 316. Moreover, "[t]he decisionmaker must be able to resolve the question with 'a yes-or-no answer for the class in one stroke.'" *Id.* (quoting *Doster v. Kendall*, 54 F.4th 398, 430–31 (6th Cir. 2022), *vacated as moot*, 144 S. Ct. 481(2023)).

Start with the elements of relevant claims.[4] *Id.* at 318 ("Only after identifying the relevant elements of each cause of action may it decide whether a yes-or-no answer would resolve an element 'for the class in one stroke." (citation modified)). A Fourteenth Amendment takings claim requires proof of two elements: (1) a cognizable property interest, and (2) a government taking of that interest without just compensation. *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 609 (6th Cir. 2016). A state-law inverse condemnation claim requires (1) a government taking of property, and (2) the absence of formal eminent-domain proceedings, with a causal link between the government's action and the harm. *Mays v. Governor of Michigan,* 954 N.W.2d 139, 148 (Mich. 2020) (citation omitted). A procedural due process claim requires (1) a protected property interest, (2) a deprivation of that interest by the government, and (3) inadequate procedural protections before the deprivation. *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). Finally, an unjust enrichment claim requires (1) that the defendant received a benefit from the plaintiff, and (2) that retention of that benefit without compensation would be inequitable. *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003).

Here, common questions of law and fact meaningfully advance each claim. One such question is whether Class Members hold a property interest in their surplus proceeds. That yes-or-no question affects the first element of the takings claim, the foundation of the inverse condemnation claim, the first element of the due process claim, and the first element of unjust enrichment. The answer will be the same for all class members, and it turns on the statutory framework rather than individualized proof.

---

[4] In Plaintiffs' view, at this stage, the four claims discussed are the only relevant claims. *See* ECF No. 437 at PageID.11109–12; *see also* ECF No. 479 at PageID.11929–30 (incorporating *id.*).

More importantly, the claims ultimately hinge on a second question: whether the Defendant Counties improperly retained surplus proceeds under the GPTA without offering former owners a chance to recover them. This question bears on the second element of the takings claim, all elements of the inverse condemnation claim, the second and third elements of the due process claim, and both elements of the unjust enrichment claim. Further, the core facts needed to answer these questions (*e.g.*, the statutory framework, the foreclosure process, and the calculation of surplus proceeds) are uniform. And the fact that these questions are both largely resolved does not undermine commonality. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 458 (6th Cir. 2020).

In sum, Plaintiffs identify common questions—chiefly, whether they held a property interest in surplus proceeds and whether the Defendant Counties improperly retained them—that can be answered in one stroke for the class. Those questions go to the heart of each claim. So the Class clears the commonality factor.

### c. Typicality

Onto another molehill: typicality. *Reese v. CNH Am., LLC*, 227 F.R.D. 483, 487 (E.D. Mich. 2005) ("[T]he test for typicality is not demanding."). The typicality requirement mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). A claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if [their] claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007). While conceptually distinct, practically, commonality and typicality tend to merge. *Dukes*, 564 U.S. at 349, n.5.

No doubt, Plaintiff Fox's claims are typical of the potential absent Class Members. Both Plaintiff Fox and the proposed Class Members' claims stem from the same practice among the

Defendant Counties: foreclosing their property, auctioning it, and retaining the surplus proceeds from the sale under the pre-PA 256 version of the GPTA. And, as defined in the Settlement Agreement, Plaintiff Fox falls within the Class, and his "injury arises from" the alleged wrong to the Class. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). Indeed, as alleged, Defendant Gratiot County retained his surplus proceeds "after seizing [his] property for tax delinquency," like all potential Class Members. *Arkona, LLC v. Cnty. of Cheboygan*, No. 1:19-CV-12372, 2020 WL 4366027, at *5 (E.D. Mich. July 30, 2020). Thus, resolving Plaintiff Fox's claims would resolve them for the class. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) ("[A]s goes the claim of the named plaintiff, so go the claims of the class.").

All in all, Plaintiff Fox stands in the same shoes as the potential Class Members. Their claims are not only similar—they are the same in all legally relevant respects. Thus, typicality is likely satisfied.

### d. Adequacy of Representation

Last up, adequacy. For this prerequisite, "[c]lass representatives must be able to 'fairly and adequately protect the interests of the class.'" *Bowles*, 121 F.4th at 553 (quoting Fed. R. Civ. P. 23(a)(4)). This "requires that the class members have interests that are not antagonistic to one another," so that the proposed representative's interests and incentives are not misaligned with those of the putative class. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (internal quotations omitted). And "[b]ecause class members must act through class counsel, the representative parties' adequacy turns in part on the competency of class counsel." *Bowles*, 121 F.4th at 553. At bottom, "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *In re Dry Max Pampers Litig.*, 724 F.3d at 721 (citation modified).

Here, there is no evidence that Plaintiff Fox's interests are at odds with the Class. His incentives align with the proposed Class Members and with the proposed Class Counsels' interests: maximizing surplus proceeds recovery. And the settlement that, in part, Plaintiff Fox and proposed Class Counsel bargained for demonstrates his adequacy and common interest. Indeed, the Agreement generally provides Class Members with not just their surplus proceeds—but 125% of them. ECF No. 479-3 at PageID.11987.

Moreover, there is no evidence that proposed Class Counsel possesses interests misaligned from the class. They have vigorously litigated this case. *See infra*, Section III, A, 3. They are also qualified and competent to represent the Class. *See id.* And like Plaintiff Fox, they negotiated a substantial remedy on behalf of the class, further demonstrating their adequacy. Accordingly, the adequacy prerequisite is likely fulfilled.

In sum, the Parties' proposed Class likely satisfies all four Civil Rule 23(a) requirements. Thus, the inquiry will shift to the Civil Rule 23(b) certification prerequisites.

### 2. Rule 23(b)(3) Requirements

Parties seeking class certification "must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod., Inc.*, 521 U.S. at 614. In essence, the implication of this second set of prerequisites "is that there are cases that satisfy the Rule 23(a) criteria . . . but are unworthy of class certification." 1 *Newberg and Rubenstein on Class Actions* § 1:3 (6th ed. 2025). Plaintiffs seek certification under Rule 23(b)(3), ECF No. 479 at PageID.11918, which requires them to show (1) that common questions of law and fact "predominate" over individual questions; and (2) that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *Amchem Prod., Inc.*, 521 U.S. at 615. Parties seeking class certification under Rule 23(b)(3) must also satisfy "an implied

- 20 -

ascertainability requirement." *Hicks*, 965 F.3d at 464 (citation modified). Plaintiffs likely satisfy all three requirements.

### a. Predominance

Predominance is the mountain of mountains for tax-foreclosure certification analyses. Civil Rule 23(b)(3) requires the party moving for class certification to show that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (emphasis omitted). This "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. To show as much, "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over" individualized issues. *Hicks*, 965 F.3d at 460 (internal quotations omitted). Ultimately, the court must "add up all the suit's common issues . . . and all of its individual issues" and "qualitatively evaluate which side predominates over the other." *Fox v. Saginaw Cnty.*, 67 F.4th 284, 300 (6th Cir. 2023) (citation modified).

In GPTA tax foreclosure cases, the Sixth Circuit has directed courts to ensure that they address three issues that could create predominance problems. The first is whether damages can be determined formulaically or whether they require property-by-property market valuations. *Id.* at 301. If the damages are based on market valuations, then "fact-specific damage trials will inevitably overwhelm common liability questions," and "individual issues" predominate. *Id.* (citation modified). The second is whether the Defendant Counties have unique defenses against class members. *Id.* The final question is whether lienholders' potential interests in Class Members' property pose individualized questions for the Class. *Id.* at 302. In the end, the Settlement Agreement's structural mechanics avoid these snags altogether.

To begin, the Settlement Agreement provides a formulaic, classwide damages calculation. The Settlement Agreement defines surplus proceeds uniformly as the difference between the property's Sale Price and the Minimum Sale Price (the sum of all delinquent taxes, interest, penalties, fees, costs, and related expenses). ECF No. 479-3 at PageID.11975, 11977. After calculating the total surplus proceeds for a Class Member, the Class Member recovers 125% of that number under the Agreement. *Id.* at PageID.11987.  Even Limited Class Members are entitled to that same formula, albeit with a greater Minimum Sale Price. *Id.* at PageID.11987. This calculation is mechanical and applies identically to every Class Member using county records for each of them. And as required, this classwide damages calculation is tied to Plaintiffs' theory of liability. *See In Re FirstEnergy Corp. Sec. Litig.*, No. 23-3940, 2025 WL 2331754, at *23 (6th Cir. Aug. 13, 2025); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

The Maximum Liability threshold modifying the damages calculation if triggered for a particular Defendant County does not alter this conclusion. If triggered, the Subclasses would kick in, and, at core, the Settlement would then feature 27 separate classes, each with formulaic classwide damage calculations. In other words, even if the Maximum Liability provision takes effect for a Defendant County, the Subclasses remedy any predominance issues related to damage calculations.

Moving on, potentially unique defenses, like *res judicata*, present no predominance problems. Essentially, this is a moot issue under the Settlement Agreement. Under the Settlement Agreement, *res judicata* concerns are mitigated by excluding properties for which surplus claims have already been adjudicated or are subject to active PA 256 Motions by non-Class claimants unless withdrawn. ECF No. 479-3 at PageID.11980. And based on the Class Period only including pre-PA 256 foreclosures, timing differences do not create individualized issues here, like they

- 22 -

would if the class included foreclosures under both the old and new versions of the GPTA. *See Howard*, 133 F.4th at 571.

Lastly, lienholders. The Sixth Circuit's concern with lienholders is that resolving competing claims between former owners and lienholders could require individualized determinations of lien validity, priority, and outstanding debt. *Fox*, 67 F.4th at 302. In its view, those determinations could consume judicial resources and "overwhelm" the common issues. *See Comcast*, 569 U.S. at 34. Or worse, if lienholders cannot recover their interest, former property owners could walk away with a windfall. *See Fox*, 67 F.4th at 302.

But the Settlement Agreement eliminates these problems in two ways. First, it defines the Class to include only those who held a fee simple interest in the property. ECF No. 479-3 at PageID.11980. Lienholders hold only security interests, not fee title. They are therefore excluded from the Class at the outset. This prevents a single property from having both a former owner and a lienholder pursuing overlapping claims within the Class. Second, the Agreement removes from the Settlement Class any former owner whose property is subject to a lienholder dispute being litigated elsewhere. It does so by excluding properties pending a non-Class Member's PA 256 Motion. *See id.* at PageID.11980. Importantly, MICH. COMP. LAWS § 211.78t allows any "person with a legal interest in property immediately before the effectiveness of a judgment of foreclosure"—including lienholders—to file a PA 256 Motion seeking surplus proceeds.[5]

---

[5] Under Michigan law, even if corporations, lienholders are "persons" under the artificial person canon of statutory interpretation, so the definition's use of "person" poses no hurdle for them. *See* Mich. Comp. Laws § 8.3l (defining person); *see also* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 273 (2012) ("Traditionally the word person—as well as whoever—denotes not only natural persons (human beings) but also artificial persons such as corporations, partnerships, associations, and both public and private organizations.").

This structure channels lienholder claims into the statutory process designed to resolve them—§ 211.78t. And § 211.78t's distribution process that accounts for competing interests avoids windfalls. So by steering lienholder disputes to that forum, the Settlement Agreement ensures they are resolved under state law without duplicative or inconsistent recovery here. In short, the Class excludes lienholders on the front end and filters out properties with active lienholder claims on the back end, leaving § 211.78t to handle competing interests.

Because Class Members' damages are seemingly calculated mechanically from common data, unique defenses are addressed through exclusions, and lienholder disputes are channeled out of the Class framework, the qualitatively significant common questions discussed above appear to predominate over any individualized issues. So the Class likely satisfies the predominance prerequisite.

### b. Superiority

Turn to superiority. To satisfy superiority, Plaintiffs must show that class treatment is "superior to all other available methods for fairly and efficiently adjudicating" the case. FED. R. CIV. P. 23(b)(3). This requirement largely rises and falls with predominance. *Young*, 693 F.3d at 545; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 144 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019); *Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 217 (E.D. Pa. 2007). When, as here, the case presents a "single course of" allegedly "wrongful conduct," class treatment is often superior. *Young*, 693 F.3d at 545. That is, "where a threshold issue is common to all class members, class litigation is greatly preferred." *Id.* So too when individual actions would yield small amounts of recovery, such that traditional mechanisms of litigation are less practical. *Id.*

Here, the class vehicle for settlement purposes is likely superior to all other methods of litigation. It resolves almost a decade's worth of surplus proceeds claims for 27 counties in one fell swoop, avoiding continued delays and litigation expenses. Not to mention, the Settlement Agreement provides more relief than a PA 256 Motion, one of the alternative methods of recovery. PA 256 Motions, and individual § 1983 for that matter, would also require immense judicial resources to manage thousands of piecemeal claims. Further, at this point, an individual § 1983 action poses a significant delay in relief, and litigants would likely face rounds of motions practice before collecting their surplus proceeds. And based on public records, some of the Class Members' surplus proceeds are minimal, and pursuing them individually could prove impractical, weighing in favor of a class remedy. *See* ECF No. 331-3. All in all, the proposed Settlement Class likely satisfies the superiority requirement.

### c. Ascertainability

Finally, the Sixth Circuit has interpreted Civil Rule 23(b)(3) to impose an implied 'ascertainability' requirement. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017). To satisfy this requirement, a "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1106 (6th Cir. 2022). A class definition is not sufficiently definite "if mini-trials become necessary to determine who is in and who is out." *Id.* (citation modified).

Although Plaintiffs do not brief this issue, the Settlement Agreement produces an ascertainable Class. To that end, the Class Definition uses objective criteria to define the Class, like, among other things, requiring Class Members to have held a fee simple interest and providing a definite Class Period. ECF No. 479-3 at PageID.11978. And objective standards help create an

ascertainable class. *See Hicks*, 965 F.3d at 465. Not to mention, because the Class Definition only includes members whose surplus proceeds—as opposed to surplus equity—were retained by Defendant Counties, no property valuations are necessary. In this way, determining whether a property's valuation exceeds the auction sale price is unnecessary to determine who is in the Class. *Cf. Tarrify*, 37 F.4th at 1106. Instead, a court can look at objective public records and discern whether the relevant tax foreclosures yielded surplus proceeds to identify the Class composition. Thus, the Class likely satisfies the ascertainability requirement.

In sum, the Plaintiffs seemingly satisfy all Civil Rule 23(a) and (b) prerequisites. This Court therefore finds that it can likely certify the Class for settlement purposes.

### 3. Class Counsel Appointment

Because the Class is likely certifiable for settlement purposes, this Court will assess the appointment of interim class counsel.[6] FED. R. CIV. P. 23(g)(1). Four factors guide this analysis: (1) the work counsel has invested in the action; (2) counsel's experience in handling complex litigation and the claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. *Id.* Plaintiffs seek the appointment of two attorneys, Mr. E. Powell Miller and Mr. Philip L. Ellison. *See* ECF No. 479 at PageID.11930–31.

The Civil Rule 23(g) factors favor appointing Attorneys Miller and Ellison. These Attorneys have unquestionably invested a substantial amount of effort in this case, just as Defense Counsel have. Indeed, this case began over six years ago, and Attorneys Miller and Ellison have represented Plaintiffs "vigorously," both before this Court and the Sixth Circuit Court of Appeals.

---

[6] This Court has already appointed Mr. E. Powell Miller and Mr. Philip L. Ellison as Interim Class Counsel. *See* ECF No. 412. But this Court will prudentially reassess their qualifications at the preliminary approval stage.

ECF No. 374 at PageID.9559. Moreover, Attorneys Miller and Ellison both have extensive experience handling class action disputes and complex constitutional litigation. *See* ECF Nos. 93-5; 93-6. As for the law governing this case, these Attorneys have extensive experience litigating the legal issues this case presents. *See, e.g.*, *Howard v. Macomb Cnty.*, 133 F.4th 566 (6th Cir. 2025); *see also* Appellant Br., *Wayside Church v. Ctny. of Vanburen*, 2025 WL 370974. As a result, Mr. E. Powell Miller and Mr. Philip L. Ellison's appointment as Interim Class Counsel, ECF No. 412, will be reaffirmed.

### B. Preliminary Approval of Settlement Agreement

Onto the preliminary approval analysis. There are two steps for approving class settlements: "(1) preliminary approval of the settlement and the content and method of class notice; and (2) final approval after notice and a fairness hearing." *Sheick v. Auto. Component Carrier, LLC*, No. 09-14429, 2010 WL 3070130, at *11 (E.D. Mich. Aug. 2, 2010) (citing *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982)).

At the preliminary-approval stage, the issue is whether the settlement "is fair enough . . . to expend the effort and costs associated with sending potential class members notice and processing opt-outs and objections." *Garner Props. & Mgmt.*, 333 F.R.D. at 626. This requires assessing whether the agreement "appears to fall within the range of possible approval" at the final-approval stage. *In re Inter–Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001). At the final approval stage, a court can only approve a settlement if it is fair, reasonable, and adequate. FED. R. CIV. P. 23(e)(2). So at the preliminary approval stage, a court must determine whether the settlement is likely fair, reasonable, and adequate. *See Moeller v. Wk. Publications, Inc.*, 649 F. Supp. 3d 530, 541–45 (E.D. Mich. 2023).

To assess a settlement's fairness, reasonableness, and adequacy, a court must consult two sets of factors. First, a court must analyze factors from Civil Rule 23(e). Second, it must probe several factors outlined by the Sixth Circuit. *UAW*, 497 F.3d at 631.

### 1. Rule 23(e) Factors

Start with the Rule 23(e) factors. Four factors govern whether a settlement is "fair, reasonable, and adequate" under Civil Rule 23(e): whether (1) "the class representatives and class counsel have adequately represented the class"; (2) "the proposal was negotiated at arm's length"; (3) "the relief provided for the class is adequate"; and (4) "the proposal treats class members equitably relative to each other." All four factors favor approval of the Settlement Agreement.

*Adequate Representation.* Plaintiff Fox and Interim Class Counsel have adequately represented the Class. *See supra* Section III, A; *see also* 4 *Newberg and Rubenstein on Class Actions* § 13:48 (6th ed. 2025) (noting that the first Rule 23(e) factor is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively"). So the first factor supports approving the Settlement Agreement.

*Arm's Length Negotiation*. The Parties negotiated the Settlement Agreement at arm's length. After vigorously litigating this case for numerous years, the Parties settled through a neutral mediator, Lee T. Silver, and there is no evidence of fraud or collusion. ECF Nos. 479 at PageID.11918, 11932; 479-3 at PageID.11968. Thus, the second Civil Rule 23(e) factor favors approval. *See Thomsen v. Morley Companies, Inc.*, 639 F. Supp. 3d 758, 768 (E.D. Mich. 2022) (finding that the parties negotiated at arm's length when they reached a mediated settlement after litigation); *Moeller*, 649 F. Supp. 3d at 541 (same); *Garner Props. & Mgmt.,* 333 F.R.D. at 627 (same).

*Adequate Relief.* This factor requires courts to assess four subfactors: (1) "the costs, risks, and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims"; (3) "the terms of any proposed attorney's fee, including timing of payment"; and (4) "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C).

The Settlement relief represents an adequate compromise. First, the Settlement Agreement is identified, ECF No. 479-3, and there is no evidence of side agreements that could undermine the Agreement's adequacy. *See Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, No. 16-CV-13777, 2024 WL 4361947, at *2 (E.D. Mich. Sept. 30, 2024). Second, while liability in this case is relatively certain, *see Bowles*, 121 F.4th at 545, the Parties acknowledge that more litigation would be complex and costly. *See* ECF No. 479-3 at PageID.11973. Specifically, the Parties emphasize procedural hurdles that could delay and limit relief if this case continued. *Id.* These hurdles could prolong an already protracted six-year fight. By contrast, the Settlement provides immediate relief at a rate that reflects the certainties about liability. Third, the proposed method of distributing relief to the Class Members is effective because it ensures that each Class Member who submits a claim obtains relief. *See generally* ECF No. 479-3. And the Parties selected a veteran claims administrator that "has administered and distributed" over "$2 billion in class-action settlement proceeds," further demonstrating effectiveness. ECF No. 480 at PageID.12025. Fourth, Attorneys' fees are capped at 20%, well below the 33% benchmark courts routinely approve. *See Garner Props. & Mgmt.,* 333 F.R.D. at 626. And because Settlement Class Members will generally receive 125% of their surplus proceeds before the fee award is deducted, the fee structure does not diminish the adequacy of relief. *See* ECF No. 479-3 at PageID.11990–91.

In short, all four subfactors support preliminary approval. Thus, the third Civil Rule 23(e) factor favors approving the Settlement Agreement.

***Equitable Treatment of Class Members.*** Finally, Civil Rule 23(e)(2)(D) requires that a settlement treat class members equitably. The Settlement Agreement provides classwide relief using a uniform formula applicable to all Class Members. *See generally* ECF No. 479-3. Recovery scales with the size of each member's surplus, ensuring proportionality. *Id.* And there are no service or incentive awards for named Plaintiffs that could undercut equitable treatment. *Moeller v. Wk. Publications, Inc.*, 646 F. Supp. 3d 923, 925–27 (E.D. Mich. 2022). As a result, this fourth factor favors approval.

In sum, all four Rule 23(e) factors support approving the Settlement Agreement. As a result, the Settlement Agreement is likely fair, reasonable, and adequate.

### 2. Sixth Circuit Factors

Turn to the Sixth Circuit factors.[7] The Sixth Circuit has provided seven factors for courts to consider before approving a class settlement: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *UAW*,

---

[7] The Federal Rules of Civil Procedure were amended in 2018 to include the four factors for approving settlement agreements. *See* FED. R. CIV. P. 23(e). Before this amendment, the Sixth Circuit developed the seven factors discussed here. *See UAW*, 497 F.3d at 631. But the advisory committee made clear that the 2018 amendment did not replace any such factors. *See* FED. R. CIV. P. 23 advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor [a circuit provided], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). This Court must therefore analyze the Sixth Circuit factors.

497 F.3d at 631. Many of these overlap with the Rule 23(e) factors. And here, they compel approval of the Settlement Agreement.

**Risk of Fraud or Collusion.** Courts "presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary." *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 838 (E.D. Mich. 2008) (citing *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006)). No evidence of fraud or collusion exists here. In addition to the presumption of no fraud or collusion, the Parties' mediated settlement process further suggests that the Settlement Agreement is not the product of malfeasance. *See Thomsen*, 639 F. Supp. 3d at 769. So the first Sixth Circuit factor encourages approval.

**The Complexity, Expense, and Likely Duration of the Litigation.** As explained for the 23(e)-adequacy factor, the Settlement Agreement represents an adequate compromise considering the complexity, expense, and duration of this case and the continued litigation of it. Thus, this factor favors approval.

**The Amount of Discovery Engaged in By the Parties.** A settlement is "more likely to be fair and reasonable under the circumstances" if the parties have conducted discovery. *Green v. Platinum Rests. Mid-Am. LLC*, No. 3:14-CV-439, 2022 WL 1240432, at *5 (W.D. Ky. Apr. 27, 2022) (citing *O'Bryant v. ABC Phones of N.C., Inc.*, No. 19-CV-02378-SHM-TMP, 2020 WL 7634780, at *14 (W.D. Tenn. Dec. 22, 2020)). This is not a fact-intensive case—it requires minimal discovery because Defendant Counties' conduct flowed from a state statute that generated public records that provide the relevant facts. And the Parties have conducted ample informal discovery to "adequately assess their case and the desirability of the proposed settlement." *Kritzer v. Safelite Sols.*, LLC, 2012 WL 1945144, at *7 (S.D. Ohio May 30, 2012). This factor thus favors approval.

***Likelihood of Success on the Merits.*** The likelihood of success on the merits is a critical factor. *Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 895 (6th Cir. 2019). In fact, according to the Sixth Circuit, this factor is "most important of the factors." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011). If the plaintiffs have a strong likelihood of success on the merits, a settlement should reflect as much by providing greater relief than it would if the plaintiffs faced considerable risks on the merits. At the same time, courts must remember that "class action settlements involve a balancing of competing interests" and risks. *Does 1-2*, 925 F.3d at 895.

Plaintiffs have a strong likelihood of success on the merits. According to the Sixth Circuit, tax-foreclosure cases challenging the pre-PA 256 version of the GPTA are "not about whether" Michigan counties "violated the law"—they did. *Bowles*, 121 F.4th at 545. Instead, this "case is about how former landowners can" recover their surplus proceeds. *Id.* So the Settlement Agreement should provide substantial relief. It does. It provides Class Members 125% of their surplus proceeds, more than a PA 256 Motion would afford them before attorneys' fees. ECF No. 479-3 at PageID.11987. Moreover, it provides Class Members with such relief without having to continue to litigate this action, which likely would include dispositive motions, adversarial class certification motions, and other costly litigation. *Id.* at PageID.11972, 11981. This factor thus supports the preliminary approval.

***The Opinions of Class Counsel and Class Representatives.*** Class counsel's endorsement of the settlement is "entitled to significant weight" and "supports the fairness of the class settlement." *Moeller*, 649 F. Supp. 3d at 543 (citation modified). Here, Interim Class Counsel supports the settlement. ECF No. 479 at PageID.11936. So this factor favors approval too.

***The Reaction of Absent Class Members.*** This factor is neutral because the proposed settlement is in the prenotice stage. *See Green v. Platinum Rests. Mid-Am. LLC*, No. 3:14-CV-439, 2022 WL 1240432, at *5 (W.D. Ky. Apr. 27, 2022) (finding that a court cannot evaluate this factor before notice); *Thomsen*, 639 F. Supp. 3d at 770 (same).

***The Public Interest.*** Because class actions are complex and unpredictable, judicial-resource-saving class settlements are encouraged and in the public interest. *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (citing *Granada Invs. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992)). Settling this class action would further the public interest by providing swift relief to Class Members who have waited for it for over six years, preserving considerable resources in the process. And because this Court finds that the relief is adequate, it further finds that the Settlement Agreement advances the public interest. This final factor therefore supports approval.

In sum, six of the seven Sixth Circuit factors militate in favor of preliminary approval, and one is neutral. Thus, because all four Civil Rule 23(e) factors also favor approval, ten of the eleven relevant factors support approving the Settlement Agreement. So this Court will do so.

### C. Proposed Notice

The last task is to assess whether Plaintiffs' proposed notice complies with Civil Rule 23(c). After preliminarily approving a settlement, the court must direct notice of the proposed settlement to all class members who would be bound by the proposal. FED. R. CIV. P. 23(e)(1)(B). Because the Class is a Rule 23(b)(3) class, notice must be "the best notice practicable" and include "individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B). The notice must convey—in plain, straightforward terms—the following: (1) what the lawsuit is about; (2) how the court has defined the class; (3) the claims, issues, or defenses at

stake; (4) that any class member may choose to appear through their own lawyer; (5) that the court

will remove from the class any member who asks to be excluded; (6) when and how to make that

request; and (7) that a final judgment in the case will bind all class members. *Id.*

Here, the proposed Notice satisfies the applicable standards: Using clear language, it

checks all seven boxes in Civil Rule 23(c). First, it describes the lawsuit and its history. 479-4 at

PageID.12000–01. Second, it provides the Class Definitions. *Id.* at PageID.12001. Third, it

outlines the claims and issues featured in this case. *Id.* at PageID.12001, 12005–06, 12013–14.

Fourth, it notifies Class Members that they may hire a separate lawyer. *Id.* at PageID.12010. Fifth,

the Notice establishes that Class Members may opt out of the Settlement and other legal options.

*Id.* at PageID.12002. Sixth, it details how to submit a claim and the relevant deadlines. *Id.* at

PageID.12007. And seventh, it explains that without opting out, Class Members are bound by the

judgment in this case. *Id.* at PageID.12003, 12014.

Finally, the proposed Notice Plan, ECF No. 480, is "the best notice that is practicable under

the circumstances." FED. R. CIV. P. 23(c)(3). In a sworn statement, the Director of Claims for the

chosen claims administrator outlines a multi-faceted Notice Plan that includes direct mail,

publication, and internet and social media notices. ECF No. 480 at PageID.12026–30. It also

establishes a website that Class members can access. *Id.* at PageID.12029. Considered together,

this Notice Plan is sufficient. *See Strano v. Kiplinger Washington Eds., Inc.*, 649 F. Supp. 3d 546,

560 (E.D. Mich. 2023). As a result, the Notice and Notice Plan will be approved.

All in all, the Settlement Agreement passes preliminary muster. So Plaintiffs' Unopposed

Motion for Preliminary Approval, ECF No. 479, will be granted. Accordingly, this Court finds

that it can likely certify the Settlement Class and Subclasses. Moreover, this Court will reaffirm

the appointment of Mr. E. Powell Miller and Mr. Philip L. Ellison as Interim Class Counsel,

preliminarily approve the Settlement Agreement, and direct notice consistent with the approved Notice Plan, ECF No. 480, to all Class Members bound by it.

## IV.

Accordingly, it is **ORDERED** that the Plaintiffs' Unopposed Motion for Preliminary Approval, ECF No. 479, is **GRANTED**.

Further, it is **ORDERED**:

1.      This Order incorporates by reference the definitions in the Settlement Agreement (a copy of which is attached to as Exhibit 2 to the Motion for Preliminary Approval), and all capitalized terms used in this Order will have the same meanings as set forth in the Settlement Agreement, unless otherwise defined in this Order.

2.      The Settlement Agreement, together with its attached exhibits and/or referenced documents, sets forth the terms and conditions for the proposed settlement and dismissal with prejudice of the Action.  The Settlement Agreement was the result of an extensive, arm's length negotiation conducted under the guidance of and with assistance from an experienced and well-regarded third-party mediator over a period of nine months.

3.      The Court will direct notice be given to the Class and Sub-Classes because giving notice is justified by Plaintiffs' showing that the Court will likely be able to approve the Settlement Agreement under Rule 23(e)(2) and certify the class for purposes of judgment on the proposed Settlement Agreement. Specifically, the Settlement Agreement preliminarily appears to be (a) fair, reasonable, and adequate considering the relevant factual, legal, practical, and procedural considerations of the Action, (b) free of collusion to the detriment of putative Class Members, and (c) within the range of possible final judicial approval, subject to further consideration thereof at the Final Approval Hearing as described below.  The Class and Sub-Classes appear likely to satisfy the prerequisites of Rule 23(a) and Rule 23(b)(3). Accordingly, the Settlement Agreement and the settlement are sufficient to warrant notice thereof and a full hearing on the settlement.

4.      If, for any reason, the Settlement Agreement is not finally approved or does not become effective, this Order, including but not limited to certification of the Class and Sub-Classes, shall be null and void and automatically deemed vacated, and neither the Settlement Agreement nor anything related to the negotiation, consideration, or approval of it shall be used, referred to, proffered, or admissible for any purpose in this Action or any other action or proceeding.  In such event, the parties and the putative Class Members shall be returned to the same litigation position that they were in before seeking preliminary approval of the Settlement Agreement, and they shall be free to raise all claims, defenses, and arguments as they would have been able to had they never negotiated or sought approval of the Settlement Agreement, including opposing class certification on any and all grounds (including but not limited to Rule 23(a) and (b)(3)).  If the Settlement Agreement is not finally approved or does not become effective, the

parties must also promptly contact the Court to schedule a status conference to establish a new scheduling order for the continuation of the Action.

5.      Solely for the purpose of settlement in accordance with the Settlement Agreement, and pursuant to Rule 23(a) and (b)(3), this Court finds that it will likely certify the following Class if the Court gives final approval to the Settlement:

> All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in any County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom the County did not refund the Surplus Proceeds.

6.      In addition, solely for the purpose of settlement in accordance with the Settlement Agreement, and pursuant to Rule 23(a) and (b)(3), this Court finds that if the Court gives final approval to the Settlement, it will likely certify Sub-Classes as to each County,[8] with a sub-class definition tied to each County, as described below:

> (i)      *Alcona County*:  The Alcona County Settlement Sub-Class means:
>
> All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Alcona County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Alcona County did not refund the Surplus Proceeds.
>
> (ii)      *Alpena County*:  The Alpena County Settlement Sub-Class means:
>
> All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Alpena County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Alpena County did not refund the Surplus Proceeds.
>
> (iii)      *Arenac County*:  The Arenac County Settlement Sub-Class means:
>
> All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Arenac County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020),

---

[8] County is a defined term in the Settlement Agreement and refers only to those Defendants in this Action who agrees to join the Settlement after appropriate action by the Defendant's Board of Commissioners and, in the case of Macomb County, its County Executive. To the extent that a Sub-Class is identified in Paragraph 6 for a Defendant that has not agreed to the Settlement, the sub-class certification is only effective if and when the Defendant agrees to the Settlement.

was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Arenac County did not refund the Surplus Proceeds.

(iv)     *Bay County*: The Bay County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Bay County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Bay County did not refund the Surplus Proceeds.

(v)     *Clare County*:  The Clare County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Clare County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Clare County did not refund the Surplus Proceeds.

(vi)     *Crawford County*:  The Crawford County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Crawford County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Crawford County did not refund the Surplus Proceeds.

(vii)     *Genesee County*: The Genesee County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Genesee County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Genesee County did not refund the Surplus Proceeds.

(viii)     *Gladwin County*:  The Gladwin County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Gladwin County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax

auction for more than the Minimum Sale Price, and to whom Gladwin County did not refund the Surplus Proceeds.

(ix)    *Gratiot County*: The Gratiot County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Gratiot County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Gratiot County did not refund the Surplus Proceeds.

(x)    *Huron County*: The Huron County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Huron County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Huron County did not refund the Surplus Proceeds.

(xi)    *Isabella County*: The Isabella County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Isabella County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Isabella County did not refund the Surplus Proceeds.

(xii)    *Jackson County*: The Jackson County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Jackson County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Jackson County did not refund the Surplus Proceeds.

(xiii)    *Lapeer County*: The Lapeer County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Lapeer County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Lapeer County did not refund the Surplus Proceeds.

(xiv)     *Lenawee County*:  The Lenawee County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Lenawee County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Lenawee County did not refund the Surplus Proceeds.

(xv)     *Macomb County*:  The Macomb County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Macomb County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Macomb County did not refund the Surplus Proceeds.

(xvi)     *Midland County*:  The Midland County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Midland County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Midland County did not refund the Surplus Proceeds.

(xvii)     *Montmorency County*:  The Montmorency County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Montmorency County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Montmorency County did not refund the Surplus Proceeds.

(xviii)     *Ogemaw County*:  The Ogemaw County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Ogemaw County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Ogemaw County did not refund the Surplus Proceeds.

(xix)     *Oscoda County*:  The Oscoda County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Oscoda County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Oscoda County did not refund the Surplus Proceeds.

(xx)      *Otsego County*:  The Otsego County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Otsego County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Otsego County did not refund the Surplus Proceeds.

(xxi)     *Presque Isle County*:  The Presque Isle County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Presque Isle County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Presque Isle County did not refund the Surplus Proceeds.

(xxii)    *Roscommon County*:  The Roscommon County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Roscommon County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Roscommon County did not refund the Surplus Proceeds.

(xxiii)   *Saginaw County*: The Saginaw County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Saginaw County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Saginaw County did not refund the Surplus Proceeds.

(xxiv)    *Sanilac County*:  The Sanilac County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Sanilac County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Sanilac County did not refund the Surplus Proceeds.

(xxv)    *St. Clair County*:  The St. Clair County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in St. Clair County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom St. Clair County did not refund the Surplus Proceeds.

(xxvi)    *Tuscola County*:  The Tuscola County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Tuscola County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Tuscola County did not refund the Surplus Proceeds.

(xxvii)    *Washtenaw County*:  The Washtenaw County Settlement Sub-Class means:

All Persons, and the estate of such persons if they are bankrupt or deceased, that owned a Property in fee simple in Washtenaw County which Property, during the Class Period (i.e. January 1, 2013 through December 31, 2020), was foreclosed through a real property tax foreclosure and sold at tax auction for more than the Minimum Sale Price, and to whom Washtenaw County did not refund the Surplus Proceeds.

7.    Consistent with the Settlement Agreement, the following are excluded from the Class and each Sub-Class:

(i)    Any Person who has released their claim for Surplus Proceeds against a County after the time of the foreclosure, or who has already resolved their claim for Surplus Proceeds against a County by agreement or by operation of a final judgment entered after the time of foreclosure.

(ii)    Notwithstanding the preceding or Paragraph 1.21 of the Settlement Agreement, any Person who would otherwise be a Class Member but for the fact that the Person resolved their claim for Surplus Proceeds against a County after

March 31, 2025 and before November 1, 2025, shall be a Limited Settlement Class Member, as that term is defined in Paragraph 1.21 of the Settlement Agreement.

8.      Consistent with the Settlement Agreement, the following will be excluded from the Settlement Class and each Settlement Sub-Class if the Court grants final approval to the Settlement and certifies the Settlement Class:

(i)      Any Class Member or Limited Settlement Class Member who has submitted a request to be excluded under Paragraph 7 of the Settlement Agreement and Paragraph 17 of this Order, that is not rejected by the Court, and which is not timely revoked under Paragraph 7.4 of the Settlement Agreement;

(ii)     Any Class Member who claims an interest in the Surplus Proceeds arising from a Property as to which any other Class Member claiming an interest in that same Property's Surplus Proceeds has submitted a request to be excluded under Paragraph 7 of the Settlement Agreement, that is not rejected by the Court, and which is not timely revoked under Paragraph 7.4 of the Settlement Agreement;

(iii)    Any Class Member who files a Surplus Proceeds Motion, which is not withdrawn by October 31, 2025; and

(iv)     Any Class Member who claims an interest in the Surplus Proceeds arising from a Property as to which any other Person claiming an interest in the same Property has filed a Surplus Proceeds Motion. However, if more than 5% of the Properties in a County are subject to Surplus Proceeds Motions filed by Persons who are not Class Members, then any Class Member who has filed a Claim against that County but who would otherwise be excluded from the Settlement Class under this paragraph shall be allowed to proceed as a Limited Settlement Class Member.

9.      As set forth in Paragraph 23 of the Settlement Agreement:

(i)      Nothing in the Settlement Agreement or this Order shall affect (positively or negatively) Defendants' administration of or conduct with respect to Public Act 256 of 2020, MCL 211.78t, or any other statute governing, or practice with respect to, real property taxation, foreclosures, or auction proceeds except as otherwise specified herein and in the Settlement Agreement.

(ii)     The Counties will not assert the failure of any Person to file a notice of intent to claim surplus proceeds by March 31, 2025, as a basis for denying a Surplus Proceeds Motion.

(iii)    Nothing in the Settlement Agreement or this Order shall prevent a Class Member from pursuing the post-judgment process for claiming "any applicable remaining proceeds from the transfer or sale of foreclosed property" set forth at MCL 211.78t, except that consistent with Paragraphs 3.5.2, if any "claimant" under MCL 211.78t(1) submits a Surplus Proceeds Motion, then all Class Members who

- 42 -

claim an interest in that Property are excluded from the Settlement Class with respect to that Property unless such motion is withdrawn by October 31, 2025.

(iv)    No County shall pay Surplus Proceeds to any Person who has filed a Surplus Proceeds Motion relating to a Property or consent to an order requiring such a payment before October 31, 2025. If a hearing is scheduled before October 31, 2025 on any Surplus Proceeds motion, the affected County shall undertake reasonable efforts to adjourn the hearing until after October 31, 2025, including informing the applicable court of the Settlement Agreement and the right of Persons to withdraw a Surplus Proceeds Motion to participate in the Settlement.

10.    Solely for the purpose of Settlement, if the Court gives final approval to the Settlement, it will likely appoint Thomas A. Fox as the representative of the Class, and the individuals listed below as the class representative for each Sub-Class. Alternative proposed class and sub-class representatives may be substituted by stipulation of the Parties or by further order of this Court before the entry of any Final Approval Order in this case.

*Alcona County*: Robert Mackenzie, Trustee

*Alpena County*: Nancy Lambert

*Arenac County*: James Grosso

*Bay County*: Brian Scherzer

*Clare County*: Timothy Widener

*Crawford County*: Anna Pence

*Genesee County*: Jeffrey Cantor

*Gladwin County*: William Beck

*Gratiot County*: Thomas Fox

*Huron County*: Kenneth McNeil

*Isabella County*: Donna Sinclair

*Jackson County:* Gloria Doty

*Lapeer County*: Cynthia Zak

*Lenawee County*: Colby Smith

*Macomb County*: Albert Moore, Jr.

*Midland County*: Robert Mackenzie, Trustee

*Montmorency County*: Lisa Dufore

*Ogemaw County*: Robert Mackenzie, Trustee

*Oscoda County*: Eugene Causley, Jr.

*Otsego County*: Randall Frank, Trustee

*Presque Isle County*: Karen Kamyszek

*Roscommon County*: Herold Reno, Jr.

*Saginaw County*: Nicole Vedrode

*Sanilac County*: Shalene Pope

*St. Clair County*: Lawrence and Brenda Edwards

*Tuscola County*: Bandacar Enterprises, Inc.

*Washtenaw County*: Jonathan Alexander

11.    RG/2 Claims Administration, LLC is hereby appointed as Claims Administrator to provide Notice to Potential Claimants as described in the Notice Plan and to administer the process of soliciting, receiving, reviewing, approving or denying claims, and distributing funds.

12.    The proposed form, content, and procedures of notice to the Potential Claimants, as described in ECF No. 480, are approved.  The Parties have discretion to jointly make non-material revisions to the Notice before dissemination. The Notice to be provided to the Potential Claimants clearly, concisely, and in plain language advises them of, among other things, the nature of the Action, the proposed Settlement Agreement, the definition of the Class and Sub-Classes, the claims the Class members and Sub-Class members would release, the consideration the Class and Sub-Classes would receive, Interim Counsel's intended application for appointment as Class Counsel and for attorneys' fees and expenses, putative Class Members' right to participate individually or through an attorney and object to the Settlement Agreement or any portion of it, putative Class Members' right to opt out and exclude themselves from the Settlement Agreement, and the binding nature of the Settlement Agreement if it is ultimately approved.  The Notice to be provided to Class and Sub-Class members is the best notice practicable under the circumstances and constitutes sufficient notice of the proposed Settlement Agreement and this Order to all persons affected by and/or entitled to participate in the settlement, in full compliance with the notice requirements of Rule 23 and due process.

13.    The form of the Claim Form is approved. The Parties have discretion to jointly make non-material revisions to the Claim Form before dissemination including revisions to format the Claims Form for use on the Claims Administrator's website.

14.     Within 14 days of entry of this Order, the Claims Administrator shall begin providing notice of the Settlement Agreement and the Final Approval Hearing to Potential Claimants in the Notice Plan.

15.     As set forth in the Settlement Agreement, the Counties shall pay all Administration Costs.

16.     The deadline for Class Members to submit a claim is 194 calendar days after entry of this Order.

17.     No later than 120 calendar days after entry of this Order or 30 days following the filing with the Court of a Fee Petition by Plaintiffs' counsel, whichever is later, any putative Class Member wishing to be excluded from the Class and any Sub-Class shall mail an opt-out request to the Claims Administrator conforming in all respects to the terms and provisions of the Notice. Those who timely and properly do so shall neither participate in the settlement nor release their claims, and they forego (a) all the benefits they might otherwise receive because of the settlement and (b) their standing to participate in the Final Approval Hearing or object to the proposed Settlement Agreement or any portion of it. A putative class member may revoke a request for exclusion within the time for making a request for exclusion; such revocation shall be in writing and submitted to the Claims Administrator. Failure to opt out in strict compliance with the time and manner requirements set forth in the Notice shall result in waiver of the right to opt out. All potential Class Members who either do not attempt to or fail to properly and timely opt out shall remain part of the Class and any applicable Sub-Classes and, to the extent the Settlement Agreement is ultimately approved, shall be bound by the settlement.

18.     The Notice shall designate the Claims Administrator as the entity to whom opt-out requests shall be sent. The Claims Administrator shall be responsible for the receipt of all responses from putative Class Members and shall preserve all opt-out requests and all other written communications from putative Class Members or any other person in response to the Notice until administration of the Settlement is complete or pursuant to further Order of this Court. All written communications received from putative Class Members and all written responses to inquiries by them relating to the Settlement Agreement and settlement shall be available at all reasonable times for inspection and copying by counsel for Plaintiffs and Defendants, subject to further order of the Court if issues of privilege or confidentiality arise.

19.     Any Class Member who does not attempt to or fails to properly and timely opt out of the Class and any applicable Sub-Classes may, but is not required to, enter an appearance either *pro se* or through counsel of that Class Member's own choosing and expense. Class Members who are in favor of the proposed Settlement need not appear at the Final Approval Hearing or take any other action to indicate their approval.

20.     Any Class Member who will challenge or object to the fairness, reasonableness, or adequacy of the Settlement Agreement or any portion of the settlement, including without limitation the amount of Interim Counsel's requested fees and expenses if appointed Class Counsel, must remain part of the Class and any applicable Sub-Classes and must serve on the Parties a timely and valid statement of Objection that complies with the Objection procedure described in the Notice. Any Objection must be filed with the Clerk of Court and postmarked no

later than 120 calendar days after entry of this Order or 30 days following the filing with the Court of a Fee Petition by Plaintiffs' counsel, whichever is later. Interim Counsel shall file all such Objections with the Court at least 14 days before the Final Approval Hearing. Any objecting Class Member may appear at the Final Approval Hearing in person, with or without such Class Member's separate counsel.  The scope of any objector's presentation of evidence or argument at the Final Approval Hearing shall be limited to such objector's written objection.  Any Class Member who fails to file and serve an objection in strict compliance with the deadlines and procedures, and containing the information required by the Notice, shall be deemed to have forever waived and forfeited the right to object to the Settlement Agreement or any part of the settlement or to raise or pursue an objection at the Final Approval Hearing or at any point thereafter, including through appeal or as part of a separate proceeding.

21.    Within ten days of the filing of the Motion for Preliminary Approval, the Claims Administrator shall cause notice to be sent to the United States Attorney General and the Attorney General for the State of Michigan. Each such notice shall contain all the information required under 28 U.S.C. § 1715. At least seven days before the Final Approval Hearing, Defendants' counsel shall file a report with the Court confirming that these notices were timely sent.

22.    All other events contemplated under the Settlement Agreement to occur after this Order and before the Settlement Fairness Hearing described in this Order shall occur as proposed in the Motion for Preliminary Approval, to the extent not inconsistent herewith.

23.    The motion for final approval and the motion for attorneys' fees and expenses shall be filed at least 56 days before the Settlement Fairness Hearing; response briefs shall be filed at least 28 days before the Settlement Fairness Hearing, and all reply briefs must be filed no later than 14 calendar days before the Settlement Fairness Hearing.

24.    A Settlement Fairness Hearing shall be held before the undersigned at **2:00 p.m. on May 20, 2026** in the United States District Court for the Eastern District of Michigan, Northern Division, 1000 Washington Ave., Bay City, Michigan 48707, to consider the fairness, reasonableness, and adequacy of the proposed Settlement Agreement, the entry of any final order or judgment in the action, any application for attorneys' fees and costs, and other related matters. The Settlement Fairness Hearing may be postponed, adjourned, conducted virtually or continued by further order of this Court without further notice to the putative Class and Sub-Classes.

25.    All proceedings in the action other than such as may be necessary to carry out the terms and conditions of the Settlement Agreement or the responsibilities related or incidental thereto are stayed and suspended until further notice of this Court.

26.    The order is applicable to the following defendants, which have approved and joined the settlement agreement: Alcona, Alpena, Bay, Clare, Crawford, Genesee, Gladwin, Huron, Isabella, Jackson, Lapeer, Lenawee, Macomb, Montmorency, Ogema, Oscoda, Presque Isle, Roscommon, Sanilac, and Tuscola Counties. The remaining defendants may immediately join the settlement and consent to be bound by this order through the filing of a notice, which shall only

be effective if signed by the Counties' counsel, the defendant seeking to join the settlement's counsel, and Interim Counsel.

**This is not a final order and does not close this case.**

Dated: August 21, 2025

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge