UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THOMAS A. FOX, et al.,

                Plaintiffs,                Case No. 1:19-cv-11887

v.                                     Honorable Thomas L. Ludington
                                     United States District Judge

COUNTY OF SAGINAW, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO ENFORCE
SETTLEMENT AGREEMENT AND DENYING PLAINTIFFS' MOTION TO VACATE
PRELIMINARY APPROVAL ORDER**

After years of zealous litigation, the Parties in this putative class action agreed to settle

after mediation. On August 21, 2025, this Court preliminarily approved the class settlement. It also

directed the designated claims administrator to issue notice of the class settlement to putative class

members.

Yet despite this settlement, the Parties remain zealous adversaries. Due to their disputes,

class notice has only been issued to part of the class. As a result, Defendants, dozens of Michigan

counties, moved to enforce the Settlement Agreement and extend the Preliminary Approval

Order's deadlines. In response, Plaintiffs moved to rescind the Settlement Agreement and vacate

the Preliminary Approval Order. For the reasons explained below, Defendants' Motion to Enforce,

ECF No. 491, will be granted, and Plaintiffs' Motion to Vacate, ECF No. 494, will be denied.

**I.**

In 2017, under Michigan's General Property Tax Act (GPTA), Defendant Gratiot County

foreclosed on and auctioned Plaintiff Thomas Fox's property for $25,000. ECF No. 482 at

PageID.12085. At that time, Plaintiff Fox had an approximately $3,000 tax delinquency on the

property. *Id.* Defendant Gratiot County retained the roughly $22,000 difference between the auction proceeds and tax delinquency. *Id.*

In June 2019, Plaintiff Fox, later joined by dozens of other Plaintiffs, filed this putative class action. *Id.* at PageID.12085–87. They sue Defendant Gratiot County and 26 other Defendant Counties. *Id.* On behalf of themselves and similarly situated residents of Defendant Counties, they seek to recover funds retained after tax-foreclosure sales. *Id.*

Legally, this case boils down to a basic principle: A "taxpayer must render unto Caesar what is Caesar's, but no more." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 647 (2023). For years, the GPTA defied that principle. As mentioned, the statute created a process that authorized Michigan counties to foreclose on and auction tax-delinquent property. ECF No. 482 at PageID.12081–84. That much is unremarkable; municipal governments have always been extended the authority to enforce and collect property taxes. *Id.* at PageID.12080–81. But until late 2020, when the auction price exceeded the delinquent taxes, interest, penalties, and fees owed, the GPTA permitted counties to keep the difference—what courts have called "surplus proceeds." *Freed v. Thomas*, 81 F.4th 655, 658–59 (6th Cir. 2023). All agree that part of the law could not stand. *Bowles v. Sabree*, 121 F.4th 539, 545 (6th Cir. 2024).

As simple as the general legal principle governing this case is, the case's resolution has not been so simple. It has featured various courts—state and federal—developing law on discrete issues affecting this case. *See, e.g.*, *Wayside Church v. Van Buren Cnty.*, No. 24-1598, 2025 WL 2829601, at *1–3 (6th Cir. Oct. 6, 2025). It has featured statutory amendments that produced new legal issues. ECF No. 482 at PageID.12083–84. It has featured flurries of procedural motions. *Id.* at PageID.12086–87. It has featured interlocutory appeals. *Id.* And it has also featured legal

gamesmanship. *Wayside Church*, 2025 WL 2829601, *12 (Kethledge, J., concurring); *Felkers v. Kent Cnty.*, No. 1:24-CV-392, 2025 WL 2887532, at *15, n.12 (W.D. Mich. Sept. 19, 2025).

After over half a decade's worth of jurisprudential and statutory development, litigation, and mediation, the Parties compromised and agreed to settle this putative class action in November 2024.[1] *See* ECF No. 482 at PageID.12079–90. That compromise yielded nine more months of negotiations and a 31-page Settlement Agreement. ECF No. 479-3. On August 5, 2025, Plaintiffs filed an unopposed motion for preliminary approval of the Agreement, with a Preliminary Approval Hearing scheduled for August 19, 2025. ECF No. 479.

Discharging oversight duties under Civil Rule 23, this Court took great care to understand the finalized Settlement Agreement after receiving it just two weeks before the hearing. *See* ECF No. 482 at PageID.12087–113; *see also Moeller v. Wk. Publications, Inc.*, 646 F. Supp. 3d 923, 925 (E.D. Mich. 2022) (rejecting a rubber-stamp approach at preliminary approval and adopting a thorough analytical approach to avoid a "potential walk back, which would waste public and

---

[1] According to the Parties, the Settlement did not include Defendant Washtenaw County, which has now purportedly rejected it. *See generally* ECF Nos. 486; 489; 492; *but see* ECF Nos. 462 at PageID.11749–52 (stipulated order joined by Defendant Washtenaw County notifying this Court, without limitation, that "the parties' counsel agreed in writing to" settle this case); 479-3 at PageID.11974; 11979 (including Defendant Washtenaw County in the Settlement Agreement); 481 at PageID.12052–53, n.1 (including Defendant Washtenaw County in motion for preliminary injunction contemplated by the Parties' litigation bar provision in the Settlement Agreement, ECF No. 479-3 at PageID.11993); 479-6 (including Defendant Washtenaw County in list of counties to approve the Settlement Agreement before the Preliminary Approval Hearing); WASHTENAW COUNTY BOARD OF COMMISSIONERS, *A Resolution Authorizing A Settlement in the Ongoing Foreclosure Litigation – Fox, et al. v. Washtenaw, et al.* (Aug. 6, 2025), https://washtenawcomi.portal.civicclerk.com/event/1567/files/attachment/4845 [https://perma.cc/HUU9-7AY7] (Defendant Washtenaw County's Board of Commissioners unanimously approving the Settlement Agreement two weeks before the Preliminary Approval Hearing); https://washtenawcomi.portal.civicclerk.com/event/1567/files/agenda/8612 [https://perma.cc/XF6Q-RRV8] (meeting minutes reflecting the same); https://washtenawcomi.portal.civicclerk.com/event/1567/media at 5:34:30–5:35:15 (Defendant Washtenaw County Board of Commissioners unanimously approving Resolution without objection).

private resources"). And after conducting the hearing and ensuring, among other things, that (1) it understood the structure and mechanics of the Settlement Agreement, (2) the Settlement Class was likely certifiable under Civil Rule 23, and (3) the settlement was generally fair, this Court preliminarily approved the Settlement Agreement. *Fox v. Cnty. of Saginaw*, No. 1:19-CV-11887, 2025 WL 2419232 (E.D. Mich. Aug. 21, 2025).

Necessarily, the Preliminary Approval Order contemplated notice to the putative class. ECF No. 482 at PageID.12122–23. To that end, it approved the Parties' proposed Notice and Notice Plan while permitting the Parties "to jointly make non-material revisions to the Notice before dissemination." *Id.* It also appointed RG/2 Claims Administration, LLC, as the Claims Administrator and directed it to "begin providing notice of the Settlement Agreement and Final Approval Hearing to Potential Claimants" within "14 days of entry of this Order." *Id.*

Right after preliminary approval, Defense Counsel sought to prepare the putative class member data for the Claims Administrator. ECF No. 491-2 at PageID.12338. Two provisions in the Settlement Agreement propelled such preparation:

> **Data from Counties.** The Counties shall provide to Interim Counsel and the Claims Administrator the following information for each Class Member: the Class Member's name; Property address; Property parcel number; Minimum Sale Price; auction sale price; Surplus Proceeds; the Class Member's last known address; and any known contact information for the Class Member (including e-mail address and telephone number). The Counties shall also provide to Interim Counsel a list of all Class Members who have submitted a notice of intent to seek the return of remaining proceeds under Michigan Compiled Laws § 211.78t and the properties with respect to which each such notice has been submitted.

***

> **Class Notice.** The Parties will cooperate in causing the Claims Administrator to administer a Notice Plan, which Notice Plan shall be submitted for the Court's approval as part of the Motion for Preliminary Approval of this settlement.

ECF No. 479-3 at PageID.11977, 11983. At some point, Defendant Macomb County was the first to send its data to the Claims Administrator. *See* ECF Nos. 491 at PageID.12324; 491-4 at

PageID.12342–43. On September 3, 2025, Defense Counsel submitted Defendant Alcona County's data to the Claims Administrator, seeking confirmation that the Claims Administrator approved of the delivered data's format. ECF No. 491-3 at PageID.12340.

Defense Counsel transmitted the remaining Counties' data over the ensuing weeks, at a pace that did not please Plaintiffs' Counsel. On September 9, 2025, Plaintiffs' Counsel emailed Defense Counsel stating that the Preliminary Approval Order required the Claims Administrator to begin mailing Notice on September 5, 2025, and that Notice could not issue without the missing data. ECF No. 494-5 at PageID.12764. Plaintiffs' Counsel repeated that concern two days later and asserted that Defendants had materially breached the Settlement Agreement. *Id.* at PageID.12765. On September 12, 2025, Defense Counsel provided most of the outstanding data sets to the Claims Administrator. ECF Nos. 491-4 at PageID.12342–43; 491-7 at PageID.12351. Three days later, the Claims Administrator emailed Counsel to ask whether "Preliminary Approval [had] been granted" in the case. ECF No. 491-4 at PageID.12342. Defense Counsel sent the remaining Counties' data on September 18, 2025. ECF No. 491-8 at PageID.12354. That same day, Plaintiffs' Counsel filed a notice alleging Defendants' breach of the Settlement Agreement and violation of the Preliminary Approval Order. ECF No. 487.

The Parties nonetheless continued with Notice preparations. On September 25, 2025, Plaintiffs' Counsel sent finalized Notice forms to the Claims Administrator. ECF No. 491-5 at PageID.12345. The record reflects no response. Plaintiffs' Counsel followed up on October 1, 2025, to ask whether the Notices had been mailed. ECF No. 491-6 at PageID.12349. That date matters. October 1, 2025, was the general deadline for putative class members to file PA 256 Motions in state court to recover surplus proceeds under the 2020 amendment to the GPTA. ECF Nos. 494-5 at PageID.12765; 482 at PageID.12083–84. And under the Settlement Agreement, any

putative class member who filed a PA 256 Motion and failed to withdraw it by October 31, 2025, was not a part of the Class. ECF No. 479-3 at PageID.11980.

After Plaintiffs' Counsel inquired about the Notices on October 1, 2025, the following week, both Plaintiffs' Counsel and Defense Counsel pressed the Claims Administrator about mailing Notices. On October 2, 2025, Plaintiffs' Counsel again asked the Claims Administrator about the status of mailing the Notice but received no response. ECF No. 491-6 at PageID.12349. The next day, the United States Supreme Court granted certiorari in *Pung v. Isabella Cnty.*, 222 L. Ed. 2d 1241 (Oct. 3, 2025). Notably, in *Pung*, the Supreme Court may overrule the current method of calculating damages used by the Sixth Circuit and Michigan in these tax-foreclosure cases—the surplus proceeds calculation—and adopt a fair market value (FMV) calculation. In so doing, it might deliver plaintiffs greater damages in such cases.[2]

At any rate, a few days later, on October 7, 2025, Defense Counsel sought an update on the Notices, asking that putative class members who had filed PA 256 Motions without lienholder disputes be notified of preliminary approval "asap." *Id.* at PageID.12348. The Claims Administrator responded that its Director was "over-scheduled th[at] afternoon" but "still working on the class data." *Id.* The Director soon added that she expected to finish that work the same day. *Id.* at PageID.12347.

When no Notice information arrived, Defense Counsel followed up on October 8, 2025, explaining: "I really need them ASAP . . . please let us know your availability for a call today to discuss the status of the notice process." *Id.* Later that day, Counsel received the Notice information. *Id.* Defendants then sent direct Notice of the Settlement to putative class members

---

[2] The Parties effectively contemplated the possibility of the damages calculation changing in the Settlement Agreement's recitals. ECF No. 479-3 at PageID.11972 ("The Settling Parties are aware of various risks. These include . . . the proper measure of damages or other remedies.").

who had filed PA 256 Motions, allowing them to withdraw their Motions before October 31, 2025, and elect to participate in this case. *See* ECF Nos. 491-11 at PageID.12360; 501-1 at PageID.13193–94. And some of those putative class members withdrew their PA 256 Motions after receiving Notice. *Id.*

But the remaining putative class members—those who did not participate in the PA 256 process—have not received Notice. The Parties sought to resolve the Notice issues through mediation on November 12, 2025. ECF Nos. 491 at PageID.12328; 494 at PageID.12576. That did not work. ECF Nos. 491 at PageID.12328; 494 at PageID.12576. And Plaintiffs used the Notice delay as a basis for suspending performance and the Settlement Agreement's effectuation. *See* ECF Nos. 491 at PageID.12310, 12320; 494; 495.

Soon after, Defendants moved to summarily enforce the Settlement Agreement. ECF No. 491. Defendants argue that any delay in sending the data and Notices does not warrant setting aside the Settlement. *Id.* at PageID.12329–31. For their part, Plaintiffs moved to vacate the Preliminary Approval Order and rescind the Settlement Agreement. ECF Nos. 494; 495.

## II.

A settlement agreement is governed by state contract law. *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (citing *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992)). Defendants argue, and Plaintiffs' Motion to Vacate assumes, that the Settlement Agreement is a binding contract. *See, e.g.*, ECF Nos. 491 at PageID.12328–31; 494 at PageID.12602. The Agreement specifies that Michigan law governs. ECF No. 479-3.

## III.

At core, Plaintiffs contend that Defendants breached the Settlement Agreement by failing to timely and accurately provide all Defendants' data so that the Claims Administrator could begin providing Notice within 14 days of Preliminary Approval. *See generally* ECF Nos. 494; 495.

Because of that delay, Plaintiffs argue, putative class members did not receive notice of the Settlement Agreement before the October 1, 2025, deadline for filing a PA 256 Motion; something they contend was a fundamental component of the Settlement Agreement. *See generally* ECF Nos. 494; 495. In their view, this breach warrants rescinding the Settlement Agreement and vacating the Preliminary Approval Order. Not so.

## A.

Under Michigan law, courts analyze settlement agreements like any other contract. *Scholnick's Importers-Clothiers, Inc. v. Lent*, 343 N.W.2d 249, 253 (Mich. Ct. App. 1983). So a settlement-rescission inquiry turns on ordinary contract principles and is available only for a material breach. *See id.*; *P.A.L. Inv. Grp., Inc. v. Staff-Builders, Inc.*, 118 F. Supp. 2d 781, 787 (E.D. Mich. 2000); *Omnicom of Michigan v. Giannetti Inv. Co.*, 561 N.W.2d 138, 141 (Mich. Ct. App. 1997). By contrast, substantial performance—which is good-faith performance that satisfies the essentials needed to achieve the contract's purpose, even if it falls short of exact compliance— does not qualify as a material breach and does not justify rescission. *See Antonoff v. Basso*, 78 N.W.2d 604, 610 (Mich. 1956); *O'Conner v. Bamm*, 56 N.W.2d 250, 253 (Mich. 1953); *Jenkins v. U.S.A. Foods, Inc.*, 912 F. Supp. 969, 973 (E.D. Mich. 1996) (citing *Gibson v. Grp. Ins. Co.*, 369 N.W.2d 484, 486 (Mich. Ct. App. 1985)). Here, Plaintiffs identify no material breach justifying rescission.

***Potential Data Delays.*** Plaintiffs first argue that Defendants breached the Settlement Agreement by providing data to the Claims Administrator too late to permit notice before the October 1, 2025, PA 256 Motion filing deadline. *See* ECF No. 494 at PageID.12597–98, 12603. This is an uphill battle. While courts assess material breach on a fact-specific basis, a modest delay in performance rarely qualifies as a material breach that justifies rescission. *See, e.g.*, *Jenkins*, 912 F. Supp. at 973; *In re Am. Cas. Co.*, 851 F.2d 794, 798 (6th Cir. 1988); *Jawad v. Hudson City Sav.*

*Bank*, 636 F. App'x 319, 322 (6th Cir. 2016); *A. E. Giroux, Inc. v. Cont. Servs. Assocs., Div. of Premium Corp. of Am.*, 299 N.W.2d 20, 21 (Mich. Ct. App. 1980); *J. S. Evangelista Dev., LLC v. APCO, Inc.*, No. 357789, 2023 WL 2051174, at *4 (Mich. Ct. App. Feb. 16, 2023); RESTATEMENT (SECOND) OF CONTRACTS § 237 (Am. L. Inst. 1981). But delay becomes material in two circumstances.

First, a delay in performance constitutes a material breach when time is of the essence. *Cooper v. Klopfenstein*, 185 N.W.2d 604, 607 (Mich. Ct. App. 1971). Time is not of the essence by default. *MacRitchie v. Plumb*, 245 N.W.2d 582, 585 (Mich. Ct. App. 1976). It becomes so only if the contract expressly says so, or if the surrounding circumstances make clear that the parties intended strict adherence to contractual deadlines. *Friedman v. Winshall*, 73 N.W.2d 248, 254 (Mich. 1955).

Second, a delay may be material when it is so substantial that it otherwise undermines an essential element of the bargain, rendering the other party's remaining performance ineffective or impossible. *Radiance Aluminum Fence, Inc. v. Marquis Metal Material, Inc.*, No. 18-12605, 2020 WL 5200958, at *2 (E.D. Mich. Sept. 1, 2020); *cf. McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (Mich. 1964).

Here, Defendants' performance in providing the data did not constitute a breach, much less a material breach. The Settlement Agreement sets no deadline for Defendants to transmit data to the Claims Administrator. *See* ECF No. 479-3. So Defendants had a "reasonable time" to perform that duty. *Pierson v. Davidson*, 233 N.W. 329, 331 (Mich. 1930) ("It is a general rule of law that where no time is stipulated, a reasonable time will be presumed. Reasonable time depends upon the facts and circumstances of each case."); *Duke v. Miller*, 94 N.W.2d 819, 820 (Mich. 1959);

*McCune v. Grimaldi Buick-Opel, Inc.*, 206 N.W.2d 742, 744 (Mich. Ct. App. 1973); *Busch Marine Grp., Inc. v. Calumet River Fleeting, Inc.*, 617 F. Supp. 3d 809, 817, n.3 (E.D. Mich. 2022).

All Defendants performed within a reasonable time. Considering the cooperation provision governing implementation of the Notice Plan, and the Preliminary Approval Order's instruction that the Claims Administrator "begin providing notice of the Settlement Agreement and the Final Approval Hearing to Potential Claimants in the Notice Plan" within 14 days, Defendants surely did not have months to discharge that obligation. *See* ECF Nos. 479-3 at PageID.11983; 482 at PageID.12123. But the Order's requirement that the Claims Administrator *start* effectuating the Notice Plan within 14 days also did not mandate that Defendants somehow provide *all* Defendant Counties' data before then. That is especially true when the Claims Administrator's approved Notice Plan includes more than just notice by mail, incorporating forms of notice that require no data, such as a printed notice published in a local newspaper and social media outreach.[3] *See* ECF No. 480. Ultimately, then, Defendants needed to transmit the data in time for the putative class members to receive direct notice with enough time to determine whether to withdraw their PA 256 Motions.

Against that backdrop, some Defendants transmitted data in the first few days of September, most within a week after, and the remainder within two weeks. That timing was reasonable—providing ample time for direct notice so that putative class members could choose between this settlement and PA 256. Thus, the Defendants' timing in transmitting the data did not breach the Settlement Agreement.

---

[3] Of course, the Claims Administrator could not begin providing this indirect notice within 14 days of the Preliminary Approval Order. The Parties (ironically) did not notify the Claims Administrator about the Preliminary Approval Order until at least September 15, 2025. *See* ECF No. 491-4 at PageID.12342.

The Agreement's structure and surrounding circumstances confirm the point. Several provisions address the PA 256 process. *See* ECF No. 482 at PageID.12087–88. But the only date that they emphasize is the October 31, 2025, PA 256 Motion withdrawal deadline. ECF No. 479-3 at PageID.11980, 11996. This emphasis on the PA 256 withdrawal deadline assumes that many potential members will decide whether to participate in this class settlement process after they file a PA 256 Motion. Likewise, Plaintiff's preliminary-approval motion emphasizes the withdrawal deadline and the need for notice in time for class members to make an informed choice between participating in this action by withdrawing their PA 256 Motion. ECF No. 479 at PageID.11939–40. On that score, again, Defendants' data submission provided ample time to notify potential class members in time for an informed PA 256-Motion withdrawal.

The record confirms that point: those who filed PA 256 motions actually received direct notice in October based on Defendants' data submission. That verifies that the data submission was timely because it shows that it gave putative class members sufficient time to decide which path to pursue. After all, some have since withdrawn their PA 256 Motions. ECF No. 501-1 at PageID.13193–94.

Other surrounding circumstances do not alter the analysis. True, the Proposed Notices assumed that potential class members would receive the Notice before the October 1, 2025, PA 256 Motion filing deadline. *See* ECF No. 480-1. That provides some support for the Plaintiffs' position.

But the Notice's assumption about the timing of notice is not dispositive, and, on balance, inferior to other measuring sticks. The Parties retained the authority to modify the Notices and, in fact, did so, suggesting that assumption is not the gold standard for measuring the timeliness of Defendants' performance. Further, the Proposed Notices focused more on the legal significance of

not withdrawing a PA 256 Motion by October 31, 2025, and less on the October 1, 2025, filing deadline. *See generally id.*

And at any rate, the assumption embedded in the proposed Notice that potential class members would receive it before October 1, 2025, does not mean that all Defendants needed to transmit their data in the first week of September. Again, most submitted data by the second week of September, and only a few submitted it 12 days before the October 1 deadline. All in all, that performance was timely.

For many of the same reasons, even assuming Defendants' timing in sending the data breached the Settlement Agreement, that delay does not constitute a material breach warranting rescission. Up front, neither the Settlement Agreement nor the Parties' conduct specifies that time was of the essence, such that *any* delay in performance establishes a material breach. *See* ECF No. 479-3. So the inquiry shifts to the usual material breach analysis: whether the delay was so substantial that it undermines the contract's essentials.

To assess the materiality of a breach under Michigan law, courts consider multiple factors. *Franklin v. Haak*, 499 F. Supp. 3d 379, 389 (E.D. Mich. 2020). These factors include the following: (1) whether the nonbreaching party received the benefit it reasonably expected; (2) the extent to which damages can compensate for any shortfall in performance; (3) the degree of partial performance already rendered; (4) the hardship termination would impose on the breaching party; (5) whether the breach was willful; (6) and the likelihood that the breaching party will complete the remaining performance. *Omnicom of Michigan*, 561 N.W.2d at 141. Here, the factors demonstrate that no material breach occurred.

Begin with the benefit of the bargain. Defendants' data submissions did not deprive Plaintiffs of what they bargained for: an opportunity to participate in the class settlement and

recover a gross 125% of their surplus proceeds, if approved. Those who filed PA 256 Motions received notice before the withdrawal deadline, which timely informed them of their choice to participate in the settlement or to recover 95% of their proceeds more quickly through the PA 256 process. And notice to the rest of the potential class participants remains possible today.

Plaintiffs argue that they lost the benefit of their bargain because this claims-made settlement inherently depended on a robust claims rate—something they say Defendants' delay has now made impossible. *See* ECF Nos. 494 at PageID.12586–90. According to Plaintiffs, Defendants' purportedly late data transmission prevented Interim Class Counsel from steering potential claimants away from the PA 256 process and into the class settlement to increase class participation. *See id.* For support, they cite general policy concerns about low claims rates in claims-made settlements, which often prompt courts to scrutinize such agreements. *See id.* (citing FEDERAL TRADE COMMISSION, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* (September 2019)). Plaintiffs seemingly suggest that, because of these policy concerns, it went without saying that the deal depended on Interim Class Counsel securing minimal participation in the PA 256 process for claims-rate purposes. The argument misses the mark for two related reasons.

First, Plaintiffs have not shown that the asserted delay undermined the claims rate. To begin, it is unclear how the PA 256 process affects the claims rate at all. Under the Settlement Agreement, individuals who pursue PA 256 relief without withdrawing are never in the Class in the first instance. ECF No. 479-3 at PageID.11980. So their absence does not depress the Class claims rate. Moreover, the facts belie Plaintiffs' argument: only 5.9% of putative class members filed PA 256 Motions. ECF No. 501-1 at PageID.13193. And in any event, Plaintiffs' argument is

speculative at this juncture because no one can know the actual claims rate until the claims period closes.

Second, and more to the point, the Settlement Agreement's text—which reigns supreme in contractual interpretation, *see Pasionek v. Pasionek*, 772 F. Supp. 3d 813, 818 (E.D. Mich. 2024)—nowhere suggests that Interim Class Counsel needed to divert affected parties from the PA 256 process. In fact, as the Preliminary Approval Order explains, the Parties structured the settlement to channel many claims out of the class framework and into PA 256 Motions to avoid complications with lienholders. ECF No. 482 at PageID.12101–02. Beyond that design choice, the Agreement simply allows potential class members to pursue PA 256 relief and prevents Defendants from resolving PA 256 Motions until the withdrawal deadline passes. ECF No. 479-3 at PageID.11995–96.

Moreover, the Agreement contemplates participation rates justifying termination in only one respect: a blow-up provision that permits a Defendant, not Plaintiffs, to exit the settlement if opt-outs from that county exceed a defined threshold. *Id.* at PageID.11992. In other words, the Parties knew how to include a blow-up provision tethered to participation metrics when they wished to do so. Yet they did not include one for Plaintiffs related to the PA 256 process. That confirms that the deal did not hinge on how many potential class members chose the PA 256 process.

Plaintiffs' appeal to generalized policy concerns about claims-made settlements does not reshape the analysis. The Parties agreed to a claims-made settlement here. *Id.* at PageID.11990. Such a settlement "is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling." 4 *Newberg and Rubenstein on Class Actions* § 13:7 (6th ed. 2025). A defining feature of

this structure is that, although only claimants receive payment, the settlement releases the claims of the entire class. *Id.* Courts and commentators often criticize these arrangements because low claims rates can cause settlements to "promise far more than they deliver," particularly when unclaimed funds revert to defendants, or the deal contains other disfavored provisions. *See id.*

But those concerns do not map onto Plaintiffs' immediate argument. Potential class members who pursue PA 256 relief instead of the class settlement do not generate improper reversions to Defendant. Unlike typical nonparticipation in a claims-made settlement, these individuals still recover proceeds through PA 256, thus avoiding any defendant windfall from released but uncompensated claims. And again, because those individuals who remain in the PA 256 process to obtain funds faster are not included in the Class, they do not reduce the Class claims rate. In this way, the policy concerns invoked do not show that the settlement inherently depended on limiting PA 256 participation. As a result, Plaintiffs failed to demonstrate that Defendants' data submissions deprived them of the benefit of their bargain. So this factor weighs heavily against a finding of material breach.

Turn to another factor: whether Defendants willfully breached the data provision. Nothing in the record establishes that they did. Nothing shows that Defendants intentionally delayed data transmission to obstruct notice. To the contrary, the record reflects consistent efforts by Defendants to provide usable data to the Claims Administrator—who did not even learn of the Preliminary Approval Order until September 15. *See, e.g.*, ECF Nos. 491-2; 491-4; 491-8. After transmitting the data, Defendants also acted promptly to facilitate notice, despite delays attributable to Plaintiffs' failure to supply finalized notice materials and the Claims Administrator's lack of responsiveness. Thus, this factor likewise weighs against a finding of material breach.

The remaining factors point in the same direction. Defendants have already rendered substantial performance: they transmitted the data, built and completed a claims website, and issued notice to a substantial portion of the potential class. They also paid the Claims Administrator's invoice in reliance on the Settlement Agreement. Rescission would expose them—and Plaintiffs—to significant litigation risk. And the record indicates that Defendants remain willing and able to complete settlement administration. Taken together, these considerations confirm that no material breach occurred.

At bottom, Plaintiffs have not demonstrated that they are entitled to rescission of the Settlement Agreement under their data-delay theory. Defendants' timing in submitting the data did not breach the Settlement Agreement. And even if it did, the breach was not material.[4]

***Macomb County Data.*** Plaintiffs advance a second theory: that Defendant Macomb County provided inaccurate data.[5] *See* ECF Nos. 494 at PageID.12598–99; 495 at PageID.12842. They contend that, given its population and prior delinquency lists, Macomb County's data should reflect more than the approximately $2 million in surplus proceeds for the class period that it

---

[4] Plaintiffs also argue that the Court should vacate the Preliminary Approval Order because asserted claims-rate concerns now make final approval impossible. *See* ECF No. 494 at PageID.12605–08. That argument is similarly unpersuasive. And the Settlement Agreement can still be administered by adjusting the deadlines in the Preliminary Approval Order and rescheduling the Final Approval Hearing. As noted below, this Court will do so. The Preliminary Approval Order otherwise remains in effect.

[5] Plaintiffs also suggest that Defendant Macomb County may have violated the Settlement Agreement by failing to copy Interim Counsel when it transmitted data to the Claims Administrator. *See* ECF No. 495 at PageID.12842. This Court need not spill much ink on that contention. Even if true, it would not amount to a material breach that justifies rescission.

currently does.[6] ECF No. 494 at PageID.12599. But this breach accusation is founded on too much speculation and not enough evidence.

For starters, Defendant Macomb County submitted an affidavit to the contrary. ECF No. 500-3. That affidavit represents that the data Defendant Macomb County initially sent was generally accurate, and, to the extent there were any inaccuracies, they were minor (totaling only $38,342.48 in surplus proceeds), which it promptly corrected. *Id.* But even ignoring that affidavit and addressing Plaintiffs' argument on a clean slate, the information they marshal as support for their theory is unavailing.

To support their theory, Plaintiffs provide a 2016 news article about tax delinquencies in Defendant Macomb County. *Id.* at PageID.12599. The article reports that the number of properties on its tax delinquency list was down 30 percent from the prior year. THE DETROIT NEWS, *Macomb County Says Tax Foreclosures Plummet 30 Percent* (July 14, 2016), https://tinyurl.com/55cu5rt3 [https://perma.cc/G92H-EWM6]. The article also states that in 2014, Macomb County paid "nearly $46 million out of the delinquent tax revolving fund to local municipalities for 27,585 properties." *Id.* From that information, Plaintiff speculates that data showing only $2 million in surplus proceeds from 2013–2020 "is obviously flawed" because "[i]f nearly $50 million passed through the fund in a 'down year,' then the total over the seven-year class period must have been several hundreds of millions." ECF No. 494 at PageID.12598–99.

But Plaintiffs' argument does not directly follow from the article. Indeed, the article does not indicate how much surplus proceeds the sales of the tax-delinquent properties generated in any given year: a figure needed to assess whether Defendant Macomb County's data passes muster.

---

[6] For what it is worth, despite Plaintiffs' assertion that Defendant Macomb County's data reflects approximately $2 million in surplus proceeds, the record reveals that it is actually around $1,081,594.18. ECF No. 500-4 at PageID.13157.

Nor does the fact that Defendant Macomb County *paid* $46 million out of its fund in 2014 reveal anything about how much *went into* the fund that year or any other year, as Plaintiffs argue. Indeed, the $46 million that left the fund that year must have been accumulated over many years, not just a single year, given that the funds were tied to over 25,000 properties. Yet according to the article, the number of properties on the foreclosure list for years at the beginning of the class period was in the hundreds.

Not to mention, the article explains that Defendant Macomb County launched a campaign to assist taxpayers facing foreclosure at the beginning of the class period. That initiative produced foreclosure deferrals and payment plans for hundreds of delinquent property owners. Such efforts would logically reduce the number of foreclosure sales and, in turn, lower annual surplus proceeds.

Plaintiffs further argue that Defendant Clare County—despite having far fewer residents than Defendant Macomb County—reported greater aggregate surplus proceeds. ECF No. 494 at PageID.12843. But that premise also assumes far too much about, for example, comparative yearly delinquency rates, foreclosure rates, and the average surplus per sale. Without more, comparing these two Defendants' data risks comparing apples to oranges. In short, without specific evidence that the data *is* inaccurate, rather than speculative theories that it *might be*, this Court cannot reasonably infer a material breach on this ground.

**Good Faith and Fair Dealing.** Plaintiffs' third theory is that Defendants violated the implied covenant of good faith and fair dealing. *See* ECF No. 494 at PageID.12603. In essence, Plaintiffs accuse Defendants of "waging a war of attrition," ECF No. 495 at PageID.12847, by steering individuals into the PA 256 process to suppress class participation and reduce their financial exposure under the Settlement Agreement. ECF No. 494 at PageID.12604–05. Plaintiffs claim that Defendants pursued this strategy by delaying data transmission and by responding to a

Freedom of Information Act (FOIA) request from an attorney seeking foreclosure lists from the class period to solicit PA 256 lienholder claimants before the filing deadline. *See id.* at PageID.12600–02, 12604–05. This argument lacks merit: like Plaintiffs' other arguments, it rests entirely on speculation.

Michigan law recognizes an implied covenant of good faith and fair dealing, which "promis[es] that neither party shall do anything that destroys or injures the other party's right to receive the fruits of the contract." *Kircher v. Boyne USA, Inc.*, No. 166459, 2025 WL 938147, at *3 (Mich. Mar. 27, 2025) (citation modified). To that end, when a contract confers discretion over performance, the law requires that party to exercise that discretion honestly and in good faith. *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975). Thus, a party alleging breach must present evidence establishing that the other party acted in bad faith when exercising contractual discretion. *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 305 (3d Cir. 2001).

Here, assuming that the data provision implicitly gave Defendants discretion over the timing of data submission, rendering the covenant applicable, Plaintiffs have not offered evidence of bad faith. Even if Defendants' data submissions were untimely, as explained above, the record does not show that Defendants deliberately delayed transmitting the data. Nor does Defendants' compliance with their statutory obligations under FOIA—by responding to a request before the statutory deadline, *see* MICH. COMP. LAWS §§ 15.231 *et seq.*—convert, at most, a modest delay into bad-faith performance.

\*\*\*

In sum, Plaintiffs have not identified a material breach. At worst, they identify no breach. At best, they identify a breach that is not a material breach. Either way, they have not cleared the

threshold to justify applying the "harsh" recission remedy. *Warren v. Hugo Scherer Estate*, 261 NW 319, 320 (Mich. 1935). As a result, Plaintiffs' Motion to Vacate, ECF No. 494, will be denied.

**B.**

Turn to Defendants' Motion to Enforce, ECF No. 491. Federal courts possess the authority to summarily enforce a binding contract. *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 646 (6th Cir. 2001). That is true even in class settlement contexts. *See Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1089 (6th Cir. 2016). Having identified no material breach, Defendants' Motion to Enforce, ECF No. 491, will be granted, and the Settlement Agreement will be summarily enforced.

**IV.**

Accordingly, it is **ORDERED** that Plaintiffs' Motion to Vacate, ECF No. 494, is **DENIED**.

Further, it is **ORDERED** that Defendants' Motion to Enforce, ECF No. 491, is **GRANTED**.

Further, it is **ORDERED** that the Parties are **DIRECTED** to update the Notice contained in ECF No. 491-15 to accord with this Opinion and Order and finalize it **on or before January 9, 2026**.

Further, it is **ORDERED** that the Claims Administrator is **DIRECTED** to provide notice via direct mail and advertisement **on or before January 23, 2026**.

Further, it is **ORDERED** that the Parties are **DIRECTED** to notify the Claims Administrator of this Opinion and Order within 5 business days of its issuance.

Further, it is **ORDERED** that the deadline to withdraw PA 256 Motions (motions filed under Mich. Comp. Laws § 211.78t as contemplated by the Settlement Agreement ¶ 1.39) to avoid automatic exclusion from the class is **EXTENDED,** and putative class members are **PERMITTED** to withdraw previously filed PA 256 Motions until the state court enters an order

on the putative class member's PA 256 Motion, **or on or before April 30, 2026, whichever is sooner**.

Further, it is **ORDERED** that the opt-out and objection deadline is **EXTENDED**, and they must be submitted **on or before April 30, 2026, or 30 days following** the filing with this Court of a Fee Petition by Plaintiffs' Counsel, **whichever is later**.

Further, it is **ORDERED** that the claims deadline is **EXTENDED**, and claims must be submitted **on or before July 16, 2026**.

Further, it is **ORDERED** that the Final Approval Hearing is **ADJOURNED** to **September 23, 2026, at 2:00 PM EDT**.

Further, it is **ORDERED** that the Preliminary Approval Order, ECF No. 482, is **AMENDED** to the extent it is inconsistent with any deadline in this Opinion and Order.

Dated: December 23, 2025           s/Thomas L. Ludington
                                               THOMAS L. LUDINGTON
                                               United States District Judge